R.M.S. TITANIC, INC., successor-in-interest to Titanic Ventures, limited partnership, Plaintiff,

v.

THE WRECKED AND ABANDONED VESSEL, Its Engines, Tackle Apparel, Appurtenances, Cargo, etc., Located Within One (1) Nautical Mile of a Point Located at 41 43′ 32″ North Latitude and 49 56′ 49″ West Longitude, Believed to be the R.M.S. Titanic, *in rem*, Defendant.

No. ACT.NO. 2:93CV902.

United States District Court,
E.D. Virginia.
Norfolk Division.

July 2, 2004.

See also 264 F.Supp.2d 367.

J. Ridgely Porter, III, Esquire, Carr & Porter LLC, Portsmouth, VA, Counsel for RMS Titanic, Inc.

Lawrence R. Leonard, Assistant U.S. Attorney, Norfolk, VA, Counsel for USA.

## MEMORANDUM OPINION AND ORDER

REBECCA BEACH SMITH, District Judge.

This matter is before the court on plaintiff R.M.S. Titanic, Incorporated's ("RMST's") "Motion for Salvage and/or Finds Award," which is scheduled for a salvage award hearing to begin on October

18, 2004. In its motion, RMST requested that the court rule on two preliminary matters prior to the hearing: (1) whether the court will recognize a 1993 Procès–Verbal issued by a French maritime official which purports to award RMST title to 1,800 artifacts raised from the wreck of the R.M.S. Titanic in 1987, and (2) whether RMST will be permitted to present evidence and argument at the October 18, 2004 hearing that it should be awarded title to all 5,900 Titanic artifacts presently in its possession under the law of finds. On May 17, 2004, the court held a hearing on these two preliminary issues. For the reasons set forth below, the court will not recognize the 1993 Procès–Verbal and RMST is estopped from arguing that it is the owner of the artifacts under the law of finds. *See infra*, Part II. Also set forth below, for the purpose of assisting RMST in preparing for the October 18, 2004 hearing, is an explanation of the factors the court will consider in fashioning RMST's salvage award. *See infra* Part III.

### I. Factual and Procedural History

This *in rem* action has been pending for over a decade, and has resulted in the publication of numerous opinions by both the United States Court of Appeals for the Fourth Circuit and this court.[1] These opinions thoroughly review much of the factual and procedural history relevant to this extended litigation and that history will not be repeated in detail here.

On April 15, 1912, the luxury liner R.M.S. Titanic ("Titanic") sunk in the North Atlantic Ocean, killing 1,523 of the 2,228 passengers and crew onboard. In 1985, a joint American–French expedition

---

1. *See, e.g., R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel ... believed to be the R.M.S. Titanic,* 286 F.3d 194 (4th Cir.2002) (*Titanic 2002*); *R.M.S. Titanic, Inc. v. Haver,* 171 F.3d 943 (4th Cir.1999); *R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel ... believed to be the R.M.S. Titanic,* 9 F.Supp.2d 624 (E.D.Va.1998) (*Titanic 1998*); *R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel ... believed to be the R.M.S. Titanic,* 924 F.Supp. 714 (E.D.Va.1996) (*Titanic 1996*).

discovered the wreck of the Titanic in international waters about 400 miles south of Newfoundland. The discoverers of the sunken vessel did not take any artifacts from the wreckage.

In the summer of 1987, RMST's predecessor-in-interest, Titanic Ventures limited partnership ("TVLP"), working in conjunction with the Institut français de recherche pour l'exploitation de la mer ("IFREMER"), recovered 1,800 artifacts over the course of thirty-two dives to the Titanic wreck.[2] All of the 1987 artifacts were taken to France, where they underwent conservation and restoration processes at the government-owned laboratories of Electricité de France, and at LP3, a privately-owned conservation laboratory in Semur–en–Auxois.

By 1993, RMST had acquired both TVLP's interest in the Titanic salvage operation and TVLP's interest in the 1987 artifacts. In June, 1993, RMST, again in conjunction with IFREMER, conducted fifteen dives to the Titanic wreck, recovering 800 artifacts. All of these artifacts were brought to Norfolk, Virginia, and on August 26, 1993, RMST filed its verified complaint in this case, requesting, *inter alia*, that it be awarded the exclusive right to recover artifacts from the Titanic wreck as salvor-in-possession.

On October 20, 1993, a French Maritime Affairs Administrator, M. Chapalain, representing the Head of the Headquarter of Lorient, and then-managing partner of TVLP, George Tulloch ("Tulloch"), executed a procès-verbal[3] ("the Procès–Verbal").

The Procès–Verbal, as translated, is entitled "Minutes of Delivery to the Salvagor of the Artifacts Recovered from the Titanic Wreck in 1987 (Article 13 of the decree n 61–1547 dated December 21, 1961 determining the regime of the wreck at sea)." In its entirety, the Procès–Verbal states as follows:

[i]n accordance with its decision dated October 12, 1993, taken pursuant to the provisions of the decree n 61–1547 dated December 26, 1961 determining the regime of the wreck at Sea, M. Chapalain, representing the Head of the Headquarter of Maritime Affairs of Lorient, has carried out this day the delivery of artifacts recovered from the Titanic wreck in 1987 and whose legal owners or heirs have not been identified pursuant to the publicity measures implemented by the French Authorities, to Titanic Ventures Limited Partnership, in its capacity as salvagor. The list of artifacts is exhibited to the present minutes together with the letter of intent of Titanic Ventures Limited Partnership dated September 22, 1993.

(*See* Mem. in Support of Finds/Salvage Award, at Ex. C.) The "October 12, 1993 decision" referred to in the Procès–Verbal consists of a letter signed by M. Tricot, the "maritime affairs administrator of 2 class." It states that, pursuant to Article 13 of the decree n 61–1547, the 1987 artifacts will be "delivered" to TVLP. Tricot further states:

As regards this delivery, I took good note of your intention mentioned in your letter dated September 22, 1993, by which you undertake to make a respectful use of the said artifacts in memory or their initial owners and *not to make any commercial operations of these artifacts,*

---

2. The 1,800 artifacts recovered in 1987 are hereinafter referred to as "the 1987 artifacts."

3. A "procès-verbal" is literally an "official record of oral proceedings." Black's Law Dictionary 1223 (7th ed.1999). According to RMST, it is "most accurately described as a detailed and authenticated account drawn up by a magistrate, police officer, or other person having authority of acts or proceedings done in the exercise of his duty." (Mem. in Supp. of Mot. for Salvage and/or Finds Award, at 36.)

*nor any sale of even one of them which-ever it would be, nor any operation which would lead to their dispersion except for exhibition purposes.*

(*See* Letter to the Court, Jan. 4, 1994, at Attachment (emphasis added)). The letter referred to by Tricot is dated September 22, 1993, addressed to M. Tricot, and signed by Tulloch. It states in relevant part that TVLP, "wishes to own" the 1987 artifacts. "[O]n behalf of" TVLP, Tulloch then states that the company "intends to make a respectfull [sic] use of the artifacts recovered from the Titanic in 1987 in memory of their initial owners." He further states that "[i]n this view, I indicate [to] you that the artifacts will only be used on [sic] a cultural purpose and will not, therefore, be part of any operations which would lead to their dispersion, but to the exception of exhibition purposes, and none of the artifacts will be sold." *Id.*

Thus, relying on TVLP's representation that the artifacts would never be commercially exploited or separated from one another, except for purposes of their public exhibition, the Procès–Verbal transfers title of all of the artifacts pursuant to Article 13 of the decree n 61–1547 dated December 21, 1961, determining the regime of the wreck at sea.

On June 7, 1994, this court issued an order in the above-captioned *in rem* action, awarding RMST the status of exclusive salvor-in-possession of the Titanic wreck. That summer, again in conjunction with IFREMER, RMST conducted another expedition to the wreck site, recovering approximately 1,000 artifacts.

On February 20, 1996, John Joslyn ("Joslyn") filed a motion pursuant to Federal Rule of Civil Procedure 60(b) asking the court to reconsider its June 7, 1994 Order and rescind RMST's salvor-in-possession status, on the basis that RMST was not fulfilling its duty as salvor-in-possession to diligently salvage the Titanic

wreck. Joslyn's motion was primarily based upon the fact that RMST had not made an expedition to the site of the Titanic wreck in nearly two years and that it was financially incapable of doing so.

In opposition to Joslyn's motion, RMST argued that, notwithstanding its extended absence from the site of the wreck, it should be permitted to remain salvor-in-possession because of its extensive on-shore restoration, conservation, and exhibition activities. (Pl. Mem. in Opp. to Mot. of John Joslyn, Mar. 1., 1996, at 16–17.) For the purpose of supporting its opposition to Joslyn's motion, RMST also filed the affidavit of Tulloch, then-president of RMST and a member of the board of directors. Among other things, Tulloch's affidavit addressed RMST's intent in recovering and preserving Titanic artifacts. In this regard, Tulloch stated that RMST, "has founded, together with the National Maritime Museum, an International Advisory Committee [ ("IAC") ] to safeguard the future of the Titanic wreck site and objects raised from it and to ensure that they are conserved to the highest standards and saved for future generations in a Titanic Memorial Museum." (Aff. of George Tulloch, Mar. 1, 1996, at ¶ 4.)

Further, in a periodic report on the status of the salvage operation submitted to the court on April 25, 1996, RMST stated that it would continue to "protect the archeological and historical integrity" of the Titanic "[w]ith the direction of the International Advisory Committee." (Periodic Report of RMST on the Progress of Recovery Operations, Apr. 25, 1996, at 7.)

At the conclusion of a May 1, 1996 evidentiary hearing, the court denied Joslyn's motion from the bench and stated that it would issue a written opinion detailing the reasons for its denial at a later date. On May 10, 1996, a written Memorandum Opinion and Order was filed. *See R.M.S.*

*Titanic, Inc. v. Wrecked and Abandoned Vessel ... believed to be the R.M.S. Titanic*, 924 F.Supp. 714 (E.D.Va.1996) (*Titanic 1996* ). The *Titanic 1996* Opinion explains that the court's factual finding that "RMST has kept its promise to maintain and preserve the TITANIC artifacts," was largely based on the establishment of the IAC "to address issues related to the future of both the wreck site and the retrieved artifacts." *Titanic 1996*, 924 F.Supp. at 718. Further, the court's factual finding that RMST had fulfilled its duties as salvor-in-possession was based on RMST's representation that it was legally bound not to sell the 1987 artifacts and its promise to the court that it would not sell the artifacts recovered in 1993 and 1994. *Id.* at 718 n. 10. In addressing the legal question of whether RMST continued to diligently perform the salvage, the court stated that it considered the factual representations made by RMST concerning its intent to raise the artifacts for the public interest.

> The Court also finds that, in a case such as this where the due diligence of a salvor in possession is at issue, the Court should compare both the salvor's representations as to its plans and the Court's expectations at the time the salvor was given exclusive rights with its actual accomplishments. In the original action, the Court used its discretion to grant RMST salvor-in-possession rights because it believed that granting exclusive rights would lead to the actual salvaging of the TITANIC and the use of the recovered artifacts in the public interest.... Furthermore, RMST promised the Court that it would keep the artifacts together and preserve them for the public.

*Id.* at 723.

During the summers of 1996 and 1998, RMST conducted further expeditions to the Titanic wreck with IFREMER, recovering additional artifacts and raising a large section of the Titanic's hull, which had been resting in the debris field near the sunken ship. On May 4, 1998, RMST filed a motion for an injunction, seeking to stop a company named Deep Ocean Expeditions ("DOE") from organizing tourist expeditions to the Titanic wreck site for the purpose of photographing it. Also on May 4, 1998, Christopher Haver ("Haver"), an individual who had already paid DOE $32,000 for the opportunity to go on an expedition, filed a declaratory judgment action in this court, seeking a declaration that he had the right to enter the Titanic wreck. On May 12, 1998, the court consolidated Haver's action with the *in rem* proceeding. On June 23, 1998, the court granted RMST's motion for an injunction, and enjoined DOE, Haver, and others from photographing the Titanic wreck, finding that the injunction was necessary to compensate RMST for its salvage efforts, given that, as salvor-in-possession, RMST could not sell any artifacts. Quoting from an earlier order, the court stated

> this is not the ordinary salvage case. The TITANIC has special historical significance and the Court recognizes the efforts of [RMST] in both preservation of the artifacts and its willingness not to sell the artifacts, thereby keeping them together in the public interest.

*R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel ... believed to be the R.M.S. Titanic*, 9 F.Supp.2d 624, 636 (E.D.Va. 1998) (*Titanic 1998* ). Thus, the court found it appropriate to "expand" traditional salvage rights and enjoin others completely from traveling to the Titanic wreck. *Id.* On appeal, the Fourth Circuit reversed the court's expansion of salvage rights, holding that the court could not enjoin DOE, Haver, and others from traveling to and photographing the Titanic wreck. *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 970 (4th Cir.1999) (*Haver* ). The court of appeals otherwise affirmed this

court's application of the law of salvage and its naming of RMST as salvor-in-possession. *Id.* at 966. On remand, this court issued an order consistent with the court of appeals' ruling and continued to monitor RMST's salvage operation through RMST's submission of periodic reports on its salvage operations and through holding hearings regarding those periodic reports. *See R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel ... believed to be the R.M.S. Titanic,* No. 2:93cv902 (E.D. Va. filed July 7, 1999).

In the summer of 2001, it came to this court's attention that RMST had plans to transfer its interest in the Titanic artifacts. On September 24, 2001, a hearing was held, and on September 26, 2001, the court issued an order finding that its previous orders to prevent sales of individual Titanic artifacts "were proper and were necessary when entered." *R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel ... believed to be the R.M.S. Titanic,* No. 2:93cv902, at 2 (E.D. Va. filed Sept. 26, 2001). On October 11, 2001, RMST appealed the September 26, 2001 Order. On October 19, 2001, the court amended its September 26, 2001 Order, to explain its position and the position it had taken in earlier orders. On October 23, 2001, RMST filed an amended notice of appeal, appealing the October 19, 2001 Order, in addition to the September 26, 2001 Order. An expedited hearing was held by the court of appeals, and on June 6, 2002, the appellate court affirmed this court's handling of the *in rem* proceeding. In conclusion, the Fourth Circuit stated:

> The *Titanic* was a historic ship, and the artifacts recovered from its wreckage therefore have enhanced value. RMST currently has a unique role as the *Titanic's* exclusive salvor; and, having performed salvage services, it has a lien in the artifacts and is entitled to a reward enforceable against those artifacts. At this stage of the proceedings, however,

we cannot conclude that RMST has title to any artifacts. We also cannot conclude that the course that the district court is pursuing violates the law of salvage or amounts to an abuse of discretion.

*R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel ... believed to be the R.M.S. Titanic;* 286 F.3d 194, 210 (4th Cir.2002) (*Titanic 2002*).

Following the *Titanic 2002* decision, this court has continued to monitor RMST's salvage efforts through the periodic reports and hearings on those reports. On February 12, 2004, RMST filed a "Motion for Salvage and/or Finds Award," which is now before the court on two preliminary matters, as set forth above. A hearing on these preliminary matters was held on May 17, 2004, at which RMST's chief executive officer and president, Arnie Geller, testified that at present RMST wishes to remain salvor-in-possession of the Titanic wreck but seeks a salvage award. Further testimony was taken on RMST's continuing salvage efforts, and argument on the two preliminary matters presently before the court was heard. The two preliminary matters are ripe for decision.

## II. Analysis

### A. *Recognition of the 1993 Procès–Verbal*

The first issue RMST has asked the court to address prior to the October 18, 2004 salvage award hearing is whether the court will respect the Procès–Verbal issued in 1993 to RMST's predecessor-in-interest, TVLP, by M. Chapalain, an administrator of maritime affairs in France. According to RMST, the Procès–Verbal grants title of 1,800 artifacts recovered from the Titanic wreck in 1987 to RMST. Under principles of international comity, however, the court will not exercise its discretion to recognize the French admin-

istrative proceeding which produced the Procès–Verbal.

## 1. Recognition of Foreign Law

■ "No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived." *Hilton v. Guyot,* 159 U.S. 113, 163, 16 S.Ct. 139, 40 L.Ed. 95 (1895). The extent to which an American court will give effect to the laws and decrees of a foreign nation is a matter of international comity.

'Comity' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, on the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

*Hilton,* 159 U.S. at 163–64, 16 S.Ct. 139. In other words, international comity is "not a rule of law, but one of practice, convenience, and expediency." *Somportex, Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3d Cir.1971). Comity may be withheld "when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Id.* Moreover, a court can refuse to recognize a foreign judgment on public policy grounds. *Jaffe v. Accredited Sur. and Cas. Co.,* 294 F.3d 584, 591 (4th Cir.2002).

■ Where a *foreign court* renders a judgment following what appears to have been a fair trial with the participation of all interested parties, an *American court* should give effect to that *court's* judgment and should not evaluate its merits.

[W]here there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in fact or in law.

*Hilton,* 159 U.S. at 202–03, 16 S.Ct. 139. In this case, however, the Procès–Verbal did not result from a full and fair adversary proceeding *before a court.* It was the result of an agreement reached between TVLP and a French official, apparently without factual presentation and without any on-the-record factual findings or any type of written legal reasoning. Thus, the *Hilton* standard for recognition of judgments does not apply.

In the context of recognition of foreign admiralty decrees, one commentator has recently pointed out that "the modern reported United States cases reveal a surprisingly small number of instances in which recognition has been sought for a foreign admiralty decree of any kind," making it "dangerous to generalize about the existence of a body of this law, much less to declare its contents." William H. Theis, "Admiralty Proceedings and the Proposed Hague Convention on Jurisdiction and Judgments," 32 J. Mar. L. & Com. 59, 81 (2001). Therefore, this court will determine whether to recognize the Procès–Verbal based on the broad principles of international comity. In the unusual circumstances of this case, there are two

reasons why the court will not recognize the 1993 Procès–Verbal.

### 2. The Administrator Lacked Authority Under French Law to Award Title to the 1987 Artifacts Without Making Factual Findings Regarding the Cost of the Salvage Service and the Value of the Saved Property

First, the process through which the Procès–Verbal was issued is suspect because the Administrator of Maritime Affairs ("Administrator") clearly lacked authority to award title to the 1987 artifacts under the provision of French law he cited. Because the value of the 1987 artifacts was substantial, French law did not permit the Administrator to transfer title to those artifacts without making factual findings regarding the value and cost of the salvage service and the recovered artifacts.

#### (a) French Laws Applicable to Salvaged Wrecks

At the time that the 1987 artifacts were salvaged,[4] Decree n 61–1547 of December 26, 1961 ("Decree"), established procedures for the disposition of abandoned property recovered at sea. Under the Decree, anyone who came upon a wrecked vessel at sea had the duty, insofar as possible, to rescue the vessel, bring it to port, and report the salvage to the Administrator of Maritime Affairs. Decree, Art. 2. The wrecked vessel was then placed under the protection and safeguard of the Administrator, who took possession, but the owner of the vessel was not divested of title. *Id.*, Art. 3. The Administrator then had to attempt to notify the vessel's owner of its recovery. *Id.*, Art. 12. The salvor was entitled to an award for its efforts. *Id.*, Art. 17. Similar to American salvage law, the salvor's award was based on (1) the expenses incurred by the salvor, including the amount of labor; (2) the skill, risk, and equipment used in saving the property; and (3) the value of the salvaged vessel. *Id.*

Under Article 18, if the owner claimed the wrecked vessel within a timely manner, remuneration for salvage was worked out between the owner and salvor. *Id.*, Art. 18. If the owner and salvor could not agree on a salvage award, then one was fixed by the commercial court. *Id.* If no owner came forward, the Administrator or another French government official proposed a salvage award. If the proposal was not acceptable to the salvor, then the commercial court determined an appropriate award. *Id.*

In sharp contrast to Article 18, and unlike any provision of American salvage law, Article 13 of the Decree provided that "[t]he Head of the Headquarter of Maritime Affairs may remit to the salvor, *as his property,* all salvage of little value *which would produce no appreciable amount at sale." Id.*, Art. 13 (emphasis added).

#### (b) Legal Procedures Employed in Reaching the 1993 Procès–Verbal

Relying *exclusively* on Article 13, the Administrator conveyed title to the 1987 artifacts to TVLP. Though in accordance with the Decree, notice was given by publication in five newspapers[5] of the recovery of the 1987 artifacts from the Titanic, the

---

**4.** Under French law in 1987, the 1910 Brussels Convention (the Convention for the Unification of Certain Rules of Law respecting Assistance and Salvage at Sea) and the domestic law of July 7, 1969, governed maritime claims. On December 20, 2002, France adopted the 1989 International Convention of Salvage, which now governs French salvage award proceedings.

**5.** The newspapers were *Le Télégramme de Breste, La Liberté du Morbihan, Ouest France, The London Times,* and *The New York Times.*

Administrator did not make any factual findings regarding the value of the artifacts, the cost of their salvage, or their importance, as was required by Article 18. Nor did the Administrator propose a monetary salvage award for RMST's approval, as was required by Article 18.

Instead, the award was made under Article 13, which presupposed a finding by the Administrator that the 1987 artifacts were "salvage of little value which would produce no appreciable amount at sale." Decree, Art. 13. In other words, in awarding title of the 1987 artifacts to TVLP under Article 13, the Administrator was implicitly finding that the value of the first 1,800 artifacts ever recovered from the Titanic wreck were almost valueless. That factual conclusion is so implausible that it casts complete doubt upon the trustworthiness of the proceedings which led to the award.[6] RMST itself estimates that the value of the artifacts recovered in 1987 is $16,687,316. (Mot. for Salvage and/or Finds Award ¶ 26.) Given the obviously substantial market value of the 1987 artifacts, the Administrator had no authority to award title to all 1,800 of them to TVLP under Article 13. The failure to follow clearly established French law calls into question the fairness and trustworthiness of the entire 1993 proceedings. Accordingly, the French decree is not entitled to deference, and this court exercises its discretion to not recognize the Procès–Verbal under principles of international comity.

### 3. Recognition of the Procès–Verbal Would Be Contrary to United States Public Policy

Second, even if the face of the Procès–Verbal did not indicate that the process

through which it was reached lacked legitimacy, the court would choose not to enforce the Procès–Verbal because doing so would be contrary to United States public policy. It is appropriate for an American court to refuse to recognize a legal determination made in another country when doing so would conflict with United States public policy. *See Jaffe*, 294 F.3d at 591 (holding that an American court can refuse to recognize a foreign judgment on public policy grounds).

Shortly after the 1985 discovery of the wreck of the Titanic, Congress enacted the Titanic Maritime Memorial Act of 1986, 16 U.S.C. §§ 450rr–450rr–6 (2000). One of the central purposes of the Act is to "provide for the designation of the R.M.S. Titanic as an international maritime memorial, and protect the scientific, cultural, and historical significance of the R.M.S. Titanic." 16 U.S.C.A. § 450rr(b)(2). Moreover, for purposes of implementing the act, the Department of Commerce, National Oceanic and Atmospheric Administration ("NOAA"), promulgated "Guidelines for Research, Exploration, and Salvage of the RMS Titanic" in 2001, which provide that "[a]ll artifacts recovered from RMS Titanic should be ... kept together and intact as project collections." 66 Fed.Reg. 18905, 18912 (Apr. 12, 2001). The agency's guidelines further state that

[a]lthough not expressly delineated, following these guidelines would mean that individual artifacts would not be sold. However, this would not necessarily preclude the sale, transfer or trade of an entire collection to a museum or other qualified institution, provided that this

6. In late 2003, for example, a menu produced for the Titanic, but given away by the ship's second officer to his wife prior to departure, sold for approximately $49,500 at an auction in London. Reuters, "Menu from the Titanic Sells for 28,800 pounds," Dec. 2, 2003, available at http://www.alertnet.org/thenews/newsdesk/L02272805.htm (site last visited May 5, 2004).

commercial transaction does not result in the dispersal of artifacts. *Id.* at 18906–07. Though these guidelines are "advisory only and are not legally enforceable," *id.* at 18909, they do reflect the public policy of the United States that artifacts raised from the Titanic wreck should not be dispersed for private economic gain.

It would contradict this public policy for the court to recognize the Procès–Verbal, because doing so would be tantamount to sanctioning the dispersal of Titanic artifacts. The public policy of the United States clearly expresses the belief that the Titanic wreck is a memorial and that any artifacts recovered from the site of the wreck should be kept together and should not be sold for commercial gain. Nevertheless, if RMST is declared the owner of the 1987 artifacts, then this court has no legal basis on which to prohibit the company from auctioning off individual artifacts or otherwise disposing of them in a manner that deprives the public of their benefit. *See generally Titanic 2002*, 286 F.3d at 209 (stating in *dicta* that RMST's argument that the district court lacks the authority to restrict how the company disposes of the artifacts *if* it is awarded title is "probably correct"). Any award of outright ownership of the artifacts to RMST would run directly counter to the stated policy of the United States Congress that research and exploration of the Titanic should be done "for the purpose of enhancing public knowledge of its scientific, cultural, and historical significance." 16 U.S.C.A. § 450rr–5. Similarly, it would fly in the face of the 2001 NOAA guidelines, which state that "[r]ecovery or excavation aimed at RMS Titanic and/or its artifacts should be granted only when justified by educational, scientific, or cultural interests," 66 Fed.Reg. at 18912, and that the Titanic artifacts "should not be dispersed through the sale of individual artifacts to private collectors such as through auction house sales." *Id.* at 18906. Because recognition of the Procès–Verbal would be against United States policy, even if the process through which the Procès–Verbal was reached appeared to conform to French law, the court would exercise its discretion not to recognize the French award of title to the 1987 artifacts to TVLP, ultimately thereby to RMST, its successor-in-interest.

## B. RMST Will Not Be Permitted to Present Evidence and Argue that it Should be Awarded Title to the Artifacts Under the Law of Finds

■ The second matter on which RMST has requested a ruling prior to the October, 2004 hearing is whether the court will permit the company to introduce evidence relating to abandonment of the artifacts for the purpose of arguing that it should be awarded title to all of the artifacts it has recovered under the law of finds. Though the past orders of this court and the court of appeals have applied the law of salvage to this case, in its most recent opinion in this matter, the Fourth Circuit expressed the belief that a salvage case could be "converted" into a finds case. *Titanic 2002*, 286 F.3d at 205. Based on this language, RMST now argues, solely for purpose of the 5,900 artifacts already in RMST's actual possession, that this matter should be "converted" and decided under the law of finds. RMST's status as exclusive salvor-in-possession of the Titanic wreck and recent representation that it wishes to retain that status,[7] however, pre-

---

7. At the May 17, 2004 hearing, Arnie Geller ("Geller"), RMST's current president and chief executive officer, testified that RMST wishes to remain as salvor-in-possession of the Titanic wreck site. (Tr. of Proceedings, May 17, 2004, at 35.) Presently, the court has no intention of rescinding RMST's status.

clude an application of the law of finds to the 5,900 artifacts already recovered. Moreover, even if RMST did not wish to remain salvor-in-possession, the court would apply the doctrine of judicial estoppel to prohibit RMST from asserting that it has acquired title to the artifacts.

### 1. The Law of Finds and the Law of Salvage

■ The common law doctrine of finds "expresses the ancient and honorable principle of 'finders, keepers.'" *Columbus–America Discovery Group v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 459 (4th Cir.1992) (*"Columbus–America I"*). "Traditionally, the law of finds was applied only to maritime property which had never been owned by anybody, such as ambergris, whales, and fish. A relatively recent trend in the law, though, has seen the law of finds applied to long lost and abandoned shipwrecks." *Id.* at 459–60 (citations omitted).

■ Before the law of finds can be applied to property lost at sea, the treasure-hunter must establish "abandonment" of the property by clear and convincing evidence. *Columbus–America I*, 974 F.2d at 464–65. Even if the property has been abandoned, however, in order to be awarded title to the property under the law of finds, the treasure-hunter also has the burden of establishing two additional elements: (1) possession of the property, and (2) intent to reduce that property to ownership.

> To justify an award of title (albeit one that is defeasible), the law of finds requires a finder to demonstrate not only the intent to acquire the property involved, but also possession of that property, that is, a high degree of control over it. . . . A would-be finder should be expected to act acquisitively, *to express a will to own* by acts designed to establish the high degree of control required

for a finding of possession. . . . If either intent or possession is found lacking, the would-be finder receives nothing; neither effort alone nor acquisition unaccompanied by the required intent is rewarded.

*Id.* at 460 (*quoting Hener v. United States*, 525 F.Supp. 350, 356 (S.D.N.Y.1981)) (emphasis added). Quoting a well-known treatise on abandonment, Judge Walter E. Hoffman of this court stated in a shipwreck case that "[p]ersonalty, on being abandoned, ceases to be the property of any person, and thenceforth is no man's property, unless and until it is reduced to possession *with intent to acquire title to, or ownership of,* it." *Wiggins v. 1100 Tons, More or Less, of Italian Marble*, 186 F.Supp. 452, 456 (E.D.Va.1960) (quoting 1 C.J.S. Abandonment § 9, at 18) (emphasis added).

■ In contrast, the award of an exclusive right to recover objects from a sunken vessel under the maritime law of salvage is not as difficult to obtain and does not require an intent to own the property recovered. "[A]lthough the law of salvage, like the law of finds, requires a salvor to establish possession over property before obtaining a right to exclude others, 'possession' means something less in the context of salvage law than in finds law." *Hener*, 525 F.Supp. at 357. Moreover, "[s]alvage law requires that to be a salvor a party must have the intention and capacity to *save* the property involved, but the party need not have the intention to *acquire* it." *Id.* (emphasis added).

### 2. RMST's Continuing Status as Salvor–in–Possession Precludes Application of the Law of Finds to the 5,900 Artifacts

Simply put, RMST cannot have its cake and eat it too. RMST asks the court to apply the law of finds to artifacts already

in its possession so that it can be awarded title of those artifacts, but the company wants the law of salvage to apply to the as-yet unrecovered artifacts in and surrounding the Titanic wreckage so that RMST, as salvor-in-possession, can retain its exclusive right to reduce those artifacts to actual possession.

The common law of finds and the maritime law of salvage, however, cannot be simultaneously applied to a shipwreck and property recovered from that shipwreck.[8] The doctrines serve different purposes and promote different behaviors. *See Hener,* 525 F.Supp. at 354–59 (explaining differing policies of and behaviors promoted by the law of finds and salvage law). Further, the role of the court in adjudicating claims under the two bodies of law is fundamentally different. In the context of a claim under the law of finds, the court is called upon to adjudicate who among multiple claimants to previously unowned *res* has the most valid claim to ownership, based upon the circumstances under which the *res* was reduced to possession. When presented with a salvage claim, ownership of the property is not the primary issue before the court; valid title in the salvaged property is assumed to be held by the entity that lost the property to the sea, and the court's role is to fashion an equitable award for the rescue and preservation of the property saved.

For all of these reasons, salvage law supplies courts with authority over property lost at sea that the law of finds does not. For example, if the law of finds is being applied to award title to the first party that can demonstrate both "possession" under finds law and an intent to own abandoned property, then the court does not have the authority to prohibit others from also attempting to recover the abandoned

---

**8.** The statement in *Brady v. The SS African Queen,* 179 F.Supp. 321, 324 (E.D.Va.1960) (Hoffman, J.), that it was "unnecessary to adjudicate libellants' rights as 'finders' or 'salvors'" because the value of the salvage service exceeded the market value of the property, has, in this court's opinion, been mischaracterized as supporting the proposition that a court can award title under the law of finds to a salvor. *See, e.g., Platoro Ltd., Inc. v. Unidentified Remains,* 695 F.2d 893, 903–04 (5th Cir.1983). In *Brady,* though the court stated that for purposes of the case at hand, it was "unnecessary" to adjudicate the salvage/finds issue, a footnote accompanying that portion of the opinion makes it clear that the court would not apply the law of finds to the *res* at issue, to which it had been applying the law of salvage. *See Brady,* 179 F.Supp. at 324 n. 2. In no case of which this court is aware has a party previously named salvor-in-possession been awarded title under the law of finds to property rescued at sea while that party was acting as a salvor. Nor has a party that was awarded title to a portion of the bounty of a sunken vessel under the law of finds then been awarded salvor-in-possession status over the remainder of the ship. Where the law of finds has been ap-plied, it has been to the exclusion of an application of the law of salvage, and vice versa. *See, e.g., Bemis v. R.M.S. Lusitania,* 884 F.Supp. 1042, 1050–51 (E.D.Va.1995) (Clarke, J.) (awarding title to artifacts already recovered from wreckage but refusing to declare plaintiff salvor of artifacts still submerged); *Wiggins v. 1100 Tons, More or Less, of Italian Marble,* 186 F.Supp. 452, 454–57 (E.D.Va.1960) (Hoffman, J.) (applying the law of finds and stating that it is "'open season' for anyone electing to participate in salvage operations in the future"). The reason behind this reluctance to apply both doctrines to the same sunken vessel is obvious: doing so would, in practice, eliminate the "possession" element of the law of finds. A treasure-hunter not yet in "possession" of abandoned property as that term is defined under the law of finds could claim status as a salvor-in-possession of that property under salvage law's more lax definition of "possession." This would allow the treasure-hunter to prohibit all others from attempting to recover the remaining abandoned property while it reduced the remaining property to actual possession, which is required for an award of title under the law of finds. *See also infra* Part II.B.3(b)(3).

property. *See Hener,* 525 F.Supp. at 354. By contrast, if the maritime law of salvage is applied, then simply upon the lesser showing of "possession" under salvage law and an intent to save the property, the court may prohibit all others from recovering property from the wreck of the vessel by naming one party salvor-in-possession. Because it would be inequitable and inconsistent to award a party both the exclusive right to recover objects on the premise that the recovery is being performed for the benefit of the objects' owners, and to award title to the objects once they are recovered on the premise that they were previously unowned, the laws of finds and salvage cannot simultaneously be applied to a shipwreck and to personalty already recovered from that shipwreck.

Thus, as long as RMST remains salvor-in-possession of the Titanic wreck, this court will not entertain argument that RMST should be awarded title under the law of finds to the 5,900 artifacts in its possession, or to any future artifacts gained while it is salvor-in-possession.[9] This result is further dictated by the Fourth Circuit's opinion in *Titanic 2002.* There, in affirming this court's application of salvage law, the appellate court recognized that "under salvage law, the salvor receives a lien in the property, not title to the property, and as long as the case remains a salvage case, the lienholder cannot assert a right to title." *Titanic 2002,* 286 F.3d at 204–05. The appellate court held that "RMST, as salvor, obtained an inchoate lien in the artifacts upon performing salvage service in connection with the *Titanic,* and it became entitled to enforce that lien through the *in rem* proceeding which is now pending before the district court." *Id.* at 205. In other words, with respect to the 5,900 artifacts already raised, the court of appeals has held that,

so long as this *in rem* action continues to progress under the law of salvage, this court has no authority to award title to the artifacts to RMST until the amount of the salvage lien is determined, the value of the artifacts is determined, and the court reaches the conclusion that sale of the artifacts would produce less than the outstanding amount of the salvage lien. *Id.* at 209. Given that neither RMST nor the court currently wish to change RMST's status as salvor-in-possession, the law of salvage continues to be applicable to this *in rem* action, and the law of finds will not be applied to the 5,900 artifacts presently in RMST's possession.

3. **The Doctrine of Judicial Estoppel Would Bar RMST from Arguing that it had the Requisite Intent to Own the Artifacts**

Moreover, even if RMST or the court did not wish that the company remain salvor-in-possession of the wreck, the court would exercise its discretion under the doctrine of judicial estoppel to bar RMST from asserting that it had the requisite intent to be awarded title to the 5,900 artifacts under the law of finds. For the past ten years, in maintaining that it should keep its court-awarded designation as sole salvor-in-possession, RMST has asserted an intent not to exclusively own the artifacts it recovered from the Titanic wreck, but to recover them for the public's benefit in addition to personal financial gain. These factual representations concerning the company's intent at the time that it recovered the Titanic artifacts, though consistent with an application of the law of salvage, are inconsistent with a ruling now that RMST is entitled to an award of title to the artifacts under the law of finds. Further, both the court and

9. As long as RMST remains salvor-in-possession, it is estopped from claiming ownership of items gained in its capacity as salvor. *See infra* text at II.B.3.

other potential salvors have relied to their detriment on RMST's representation of its intent at the time of making recovery dives. Therefore, application of the doctrine of judicial estoppel would be appropriate in this case.

### (a) The Doctrine of Judicial Estoppel

"Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (*quoting Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895)). "This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire*, 532 U.S. at 749, 121 S.Ct. 1808 (internal quotations omitted). "The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." *Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir.1996). "Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." *New Hampshire*, 532 U.S. at 750, 121 S.Ct. 1808.

While the circumstances under which judicial estoppel may be appropriately invoked are not reducible to any precise formula or set of prerequisites, the courts have recognized three factors that typically inform the discretionary decision of whether a party is judicially estopped from asserting a position. *Id.* First, the party's present position must be "clearly inconsistent" with its earlier position. *Id.* The position sought to be estopped must be one of fact rather than law or legal theory. *1000 Friends v. Browner*, 265 F.3d 216, 226 (4th Cir.2001). Second, the court should consider whether it or another court was persuaded by the party's earlier position. *New Hampshire*, 532 U.S. at 750, 121 S.Ct. 1808. Third, the court should consider whether the party would derive an unfair advantage by the assertion of the new position if it were not estopped from doing so. *Id.* at 751, 121 S.Ct. 1808.[10]

### (b) Application of the Doctrine to RMST's Finds Claim

As to the first factor, in the course of being awarded and maintaining its status as sole salvor-in-possession of the Titanic wreck site, RMST repeatedly made factual assertions about its intent that are inconsistent with the position that it should be awarded title to Titanic artifacts under the law of finds. *See infra* at II.B.3(b)(1). Second, this court was persuaded by the facts asserted by RMST in naming it sole

---

**10.** Citing *Lowery* and other cases, the *1000 Friends* court stated that a requirement of judicial estoppel is that "the party sought to be estopped must have intentionally misled the court to gain unfair advantage." *1000 Friends*, 265 F.3d at 227. While in most cases where the doctrine of judicial estoppel has been applied to bar the assertion of a position, the element of intentional misleading was present, the Supreme Court in *New Hampshire* applied the doctrine in the absence of any allegation of bad faith. Thus,

intentional misleading, while often highly relevant to the discretionary decision of whether to invoke the doctrine of judicial estoppel, is not always a prerequisite to its application. *See also New Hampshire*, 532 U.S. at 751, 121 S.Ct. 1808 ("In enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts.").

salvor-in-possession. *See infra* at II. B.3(b)(2). Third, RMST would derive a significant and unfair advantage if the court were to apply the law of finds to the artifacts recovered from the wreck of the Titanic at this stage in this *in rem* proceeding. *See infra* at II.B.3(b)(3). Therefore, under the doctrine of judicial estoppel, the court would exercise its discretion to bar RMST from presenting evidence for the purpose of arguing that it should be awarded title to the artifacts under the common law of finds rather than a salvage award under maritime law.

### (1) RMST Previously Asserted a Factual Position Inconsistent With an Award of Title Under the Law of Finds for the Purpose of Retaining its Salvor–in–Possession Status

In order to maintain the *exclusive* right to recover artifacts from the Titanic wreck as salvor-in-possession, RMST has made repeated representations that are inconsistent with an award of title to the property under the law of finds. Specifically, RMST has frequently represented to this court that it lacked the intent to acquire title in the artifacts recovered from the wreck at the time it was acquiring them. Intent to acquire ownership is a necessary element of any award under the law of finds.

Rather than diving to the wreck to acquire title to the artifacts it recovered, RMST represented that it was diving with the intent of recovering them for the public benefit. In other words, Titanic represented that it did not believe it had an *exclusive* right to possession of artifacts raised. "The right to exclude others is generally one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (citation omitted). Instead, RMST represented

that it believed that the public had at least a partial possessory right to the artifacts it recovered and that it was recovering those artifacts in part for the public benefit.

For example, RMST represented to the court that "RMST has worked with a number of organizations to establish an International Advisory Committee ("IAC") whose purpose is to develop a strategy for safeguarding the TITANIC and the artifacts recovered from it." *Titanic 1996,* 924 F.Supp. at 723. RMST also represented to the court that it would continue to "protect the archeological and historical integrity" of the Titanic "[w]ith the direction of the [IAC]." (Periodic Report of RMST on the Progress of Recovery Operations, Apr. 25, 1996, at 7.) Entering an agreement to co-supervise the artifacts raised from the Titanic wreck before having taken actual possession of all of them is inconsistent with an intent to exclusively own those artifacts.

Moreover, RMST's repeated representations that the artifacts would never be sold and would be kept together were also factual representations relevant to RMST's intent at the time it salvaged the artifacts. A company that believed it was the owner of such artifacts would have no reason to make such promises and representations, because an owner is free to dispose of its own property in any manner it sees fit. The fact that RMST repeatedly asserted to this court that the artifacts would not be sold individually is evidence of RMST's lack of intent to acquire ownership of the artifacts at the time they were recovered from the Titanic wreck. Rather than believing that it was the exclusive owner of artifacts recovered from the Titanic wreck, RMST represented that its intent at the time it recovered those artifacts was, at least in part, to preserve them for the public, who had at least a partial ownership interest in the artifacts because of

their historical and cultural significance. *Cf.* Titanic Maritime Memorial Act of 1986, 16 U.S.C. § 450rr(a)(1) (finding that the Titanic wreck "is of major national and international cultural and historical significance, and merits appropriate international protection").

### (2) The Court Relied Upon and Was Persuaded by RMST's Representations

Based upon the factual representations made by RMST, for the past ten years this court has been convinced that RMST lacked the intent to acquire ownership of the artifacts it recovered from the Titanic wreck, but did have sufficient possession of the entire wreck and an intent to save the artifacts under the law of salvage. Because of this belief, on June 7, 1994, the court granted RMST an *exclusive* right to salvage the entire wreckage as a salvor-in-possession. The court has entered numerous orders since 1994 protecting RMST's exclusive salvor's rights to the Titanic wreck. Several of these orders expressly state, as a basis for the award of exclusive rights, RMST's representations regarding its intent to recover the artifacts on behalf of the public. *See, e.g., Titanic 1996*, 924 F.Supp. at 723 (noting that one reason the court used its discretion to grant RMST salvor-in-possession status was that "RMST promised the court that it would keep the artifacts together and *preserve them for the public*") (emphasis added); *Titanic 1998*, 9 F.Supp.2d at 636 ("The TITANIC has special historical significance and the Court recognizes the efforts of [RMST] in both preservation of the artifacts and its willingness not to sell the artifacts, thereby keeping them together in the public interest.") (citation omitted). Had the court believed that RMST had the requisite intent to own the artifacts it was recovering, the court would not have con-

tinued RMST as exclusive salvor-in-possession. If the law of finds were to be applied to the Titanic wreck, there would have been no basis to exclude other treasure-hunters, like Joslyn and Haver, from recovering abandoned artifacts from the wreck.[11]

### (3) Permitting RMST to Argue Now that it Had the Requisite Intent to Own the 5,900 Artifacts Already Recovered Would Give it a Significant Unfair Advantage

It would be extraordinarily unfair to the would-be salvors that this court has enjoined from performing recovery operations on the Titanic wreck for the court to rule at this point that RMST had the requisite intent to own the artifacts raised from the Titanic wreck to award it title to those artifacts as a finder. A party or a court has no right to stop others from recovering abandoned property subject to the law of finds. Rather, the court declared RMST as the sole salvor-in-possession, and for the past ten years the court has prevented numerous would-be salvors of the Titanic wreck from taking any artifacts. By this court's orders, RMST was given the exclusive right to recover as many artifacts as it could from the debris field surrounding the wrecked vessel. If the court now rules that all of the artifacts surrounding the Titanic wreck were abandoned and that RMST had the requisite intent when it recovered its 5,900 artifacts to become owner of those artifacts under the law of finds, RMST has been given an enormous commercial advantage over all other would-be salvors of the wreck, who have for over a decade been precluded from performing any recovery operations. Essentially, by manipulating a murky intersection of maritime law and common law, RMST will have succeeded in obtain-

---

11. *See supra* Part II.B.2.

ing a court-ordered and court-enforced ten-year head start on the rest of the world in obtaining property that, under the law of finds, the entire world had an equal claim to recovering. This court will not do this and will continue to insist that its orders be followed regarding salvage of the Titanic.[12]

### III. The October 2004 Hearing

Beginning on October 18, 2004, this court will hold a hearing for the purpose of determining the salvage award RMST will receive for the services it performed in recovering the 5,900 artifacts from the Titanic wreck. *See Titanic 2002*, 286 F.3d at 207–08. For the purpose of RMST's preparation for that proceeding, it is useful to set forth some of the relevant law on the determination of salvage awards and to explain how the court will make its discretionary calculation of the appropriate amount to award RMST for its salvage services.

■■■ For approximately the last 3,000 years, the law of admiralty "has uniformly held that those who voluntarily come to the assistance of fellow seamen in distress and perform salvage are entitled to be rewarded." *Titanic 2002*, 286 F.3d at 202. The salvor's reward does not come in the form of title to any of the property he rescues, however, but rather comes in the form of a "salvage award," expressed as a sum of money. *See Platoro Ltd., Inc. v.*

*The Unidentified Remains of a Vessel*, 695 F.2d 893, 903–04 (5th Cir.1983) ("We cannot find a case where the salvage award was expressed in terms of the *res* rather than in dollars, except where the salvage award was made alternatively with an award of title to the *res* under the law of finds."). In *Titanic 2002*, the Fourth Circuit explained that

[t]he principal method of enforcing a salvor's award is through the recognition of a salvor's lien in the property saved. This maritime lien arises from the moment salvage service is performed, and, as with any other lien, secures the payment of the as-yet-to-be-determined salvage award. Such liens are a temporary encumbrance on the property saved, lasting only until payment of a salvage award can be made.

*Titanic 2002*, 286 F.3d at 203. Only in cases where the salvage award is equal to or exceeds the sale value of the property, and all parties entitled to a salvage award are before the court, can the court award title to the property rather than proceeding with a court-ordered sale of the *res*. *See id.* at 204. Even in cases where the salvage award is equal to or exceeds the market value of the property, it is a matter of the court's discretion whether to award title to the property or to sell the property through court-ordered sale and pay the proceeds over to the salvor. *Id.*

---

12. On June 18, 2004, the United States became the second nation, after Great Britain, to sign an international agreement drafted by delegations of those two nations, Canada, and France, which agreement designates the Titanic wreck as an international memorial. *See* 16 U.S.C. § 450rr(b)(2) (stating that one purpose of the Titanic Maritime Memorial Act of 1986 is "to direct the United States to enter into negotiations with other interested nations to establish an international agreement which will provide for the designation of the R.M.S. Titanic as an international maritime memorial, and protect the scientific, cultural, and historical significance of the R.M.S. Titanic.") By its own terms, the international agreement takes effect when it has been signed and ratified by two of the four nations. Congress has not yet enacted legislation implementing the international agreement, which agreement therefore does not have an immediate effect upon RMST's salvage rights or this court's authority to designate RMST salvor-in-possession. The court is mindful, however, that implementation of the international agreement may require evaluation by the court of RMST's continued salvor-in-possession status.

## A. Determining Salvage Awards

■ The seminal case in the United States on salvage awards is *The Blackwall*, 77 U.S. (10 Wall.) 1, 19 L.Ed. 870 (1869). In that case, the Court stated that "compensation as salvage is not viewed . . . merely as pay, on the principle of a *quantum meruit*, or as remuneration PRO OPERE ET LABORE, but as a reward for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." *The Blackwall*, 77 U.S. (10 Wall.) at 13. "In setting a salvage award, the court of admiralty becomes a court of equity." *Columbus–America I*, 974 F.2d at 468. The award "may properly be increased, diminished, or wholly forfeited, according to the merit or demerit of the salvor, in relation to the property saved." *Id.* (quoting W. Marvin, *A Treatise on the Law of Wreck and Salvage* § 218, at 226 (1858)). The amount of the salvage award is "primarily a matter of judgment to be exercised by the trial court, and, beyond a careful examination of the facts, little remains for the appellate court except to determine whether the judgment has been exercised in accordance with the general principles respecting salvage." *Columbus–America Discovery Group v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 569 (4th Cir. 1995) (*Columbus–America II*). It is an "extremely deferential standard of review" on appeal. *Id.*

■ In the Fourth Circuit, the discretionary salvage award is informed by seven factors, the first six of which were announced in *The Blackwall*:

> (1.) The labor expended by the salvors in rendering the salvage service. (2.) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3.) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4.) The risk

incurred by the salvors in securing the property from the impending peril. (5.) The value of the property saved. (6.) The degree of danger from which the property was rescued.

*Id.* at 14. In *Columbus–America I*, the Court added a seventh factor, "the degree to which the salvors have worked to protect the historical and archeological value of the wreck and the items salved." *Columbus–America I*, 974 F.2d at 468. Taking into consideration these seven factors, the court should award the successful salvor "liberal compensation." *The Blackwall*, 77 U.S. (10 Wall.) at 13.

■ The maximum sum that can be awarded to all parties for the successful salvage of property lost at sea is the present market value of the property. *Platoro*, 695 F.2d at 904. "If the award exceeded that value, the owner would not be benefitted but burdened by the service, a result contrary to the goals of salvage law." *Id.* "This is true even where the salvor's expenses exceed the value of the *res;* in that case, the salvor's actions have caused a net economic loss to society, also contrary to the result sought by salvage law." *Id.*

■ Moreover, "[t]he total award must include the contributions of *all* co-salvors." *Id.* For example, if the salvage was accomplished through a joint venture, then the total award comprises the awards to both parties to the joint venture. *Id.* This is true even if one of the joint venturers is not actually seeking a salvage award in the pending *in rem* action. *The Blackwall*, 77 U.S. (10 Wall.) at 15. In *The Blackwall*, the Court stated:

> Salvors are not deprived of a remedy because another set of salvors neglect or refuse to join in the suit, nor will such neglect or refusal benefit the libellants by giving them any claim to a larger compensation, as the non-prosecution by

one set of salvors enures [sic], not to the libellants prosecuting the claim, but to the owners of the property saved.

*Id.* In other words, to the extent that the plaintiff in the *in rem* action was assisted in performing the salvage, the portion of the total salvage award it receives should be reduced proportionately.

 Finally, because a salvage award is a reward for performing salvage service, *see The Blackwall,* 77 U.S. (10 Wall.) at 14, rather than payment for the property recovered by the salvor, to the extent that a salvor has already been monetarily rewarded by virtue of its possession of salvaged artifacts, its salvage award should be accordingly reduced. In this regard, RMST's salvage of the Titanic wreck presents a novel circumstance. In no other case known to the court, in which a salvage award was calculated following an evidentiary hearing, has the property saved had significant pre-salvage award exhibition value that has been a major source of income for the salvor-in-possession. The salvor should not receive additional reward for his services simply because the court chose not to sell the saved property immediately after it came within the court's jurisdiction. *Cf. The Blackwall,* 77 U.S. (10 Wall.) at 15 (holding that one salvor does not benefit from the fact that another salvor chooses not to seek an award in the *in rem* proceeding). Thus, principles of equity dictate that the salvage award should be reduced by any amount of payment already received on account of the performance of the salvage service, in particular, the monetary benefits of the exhibitions of the recovered artifacts.

## B. *Application to the October 18, 2004 Hearing*

Based on the foregoing principles, the October 18, 2004 hearing will proceed as follows. First, the court will determine the market value of the approximately 5,900 artifacts RMST has raised from the Titanic wreck. Evidence, including expert testimony, as to the value of the salvaged artifacts will be taken at this time, as will any argument relating to the value of the 5,900 artifacts salvaged from the Titanic wreck.[13] The court's determination of the market value of the artifacts salvaged will serve as the maximum amount that can be awarded to all parties who participated in recovery operations on the Titanic wreckage.

Second, the court will take evidence (including expert testimony) relating to the remaining five *Blackwall* factors, and the *Columbus–America I* factor of preservation efforts.[14] RMST must present evidence not only of its own contribution to the salvage efforts, but must also submit evidence of co-venturers' contributions,[15] *including* contributions made on-shore to preserve the artifacts recovered.

Third, based on the evidence presented, and in its discretion, the court will determine what an appropriate total salvage award is, and what proportion of the total salvage award RMST is entitled to recover. In other words, the court will fix a *total* salvage award, and then determine,

---

**13.** If necessary, the court will appoint its own expert pursuant to Rule 706 of the Federal Rules of Evidence.

**14.** *See supra* note 13.

**15.** In other words, RMST must disclose any uncompensated *or undercompensated* services provided by IFREMER, the government-owned laboratories of Electricité de France, the privately-owned laboratories in Semur-en–Auxois, the P.P. Shirov Institute of Oceanology, and any other persons or entities that have assisted in the recovery or preservation of the wreckage who were not fully compensated by RMST for their services, even if those entities are government-funded and therefore not likely to ever seek a salvage award.

based on the contribution of RMST relative to the uncompensated or undercompensated services of other entities who either participated in recovering or preserving Titanic artifacts, what portion of that total salvage award RMST is entitled to receive.

Fourth, the court will take evidence, including all of RMST's past filings with the United States Securities and Exchange Commission, and any other documents relating to remuneration it received for the display of Titanic artifacts, regarding the amount of money RMST has already received by virtue of its salvor-in-possession status and its possession of the Titanic artifacts. This shall include evidence of payments received for the sale of licenses to produce and sell Titanic documentaries.[16] The court will then reduce RMST's portion of the total salvage award by whatever amount of money it has already received because of its status as exclusive salvor-in-possession and because of its possession of the 5,900 artifacts.

Following the October, 2004 hearing and the court's determinations based on the evidence presented at that hearing, the court will then decide how to proceed in order to pay the salvage award, with the least disruption to the artifacts as a whole collection. Depending upon the outcome of the October, 2004 hearing, the United States Marshal may have to take delivery of the 5,900 artifacts. At that time, the artifacts may either be offered for public sale as a collection, or they may be sold or otherwise transferred to a museum with appropriate restrictions thereon. Out of the value of the salvaged property, RMST will receive its salvage award in currency.[17] Subject to the court's continuing oversight of RMST's sole salvor-in-possession status, the company will retain its status after receiving this periodic salvage award for the first 5,900 artifacts recovered. RMST may then seek future salvage awards pursuant to the dictates of this Memorandum Opinion and Order and the actions of the United States and other nations involved in the preservation of the Titanic wreck.[18]

### IV. Conclusion

For the reasons set forth above, the court will not recognize the 1993 Procès–Verbal under principles of international

---

**16.** *See, e.g., Titanic 1998*, 9 F.Supp. at 637 (noting that in 1998, RMST had a charter agreement with IFREMER worth $1.5 million, and licensing agreements with Discovery Channel and NBC worth $6 million). *See also* Tr. of Proceedings, Apr. 14, 2003, at 33 (testimony of Arnie Geller) (stating that average income from exhibition contract with Clear Channel Communications has been approximately $2.5 million annually).

**17.** RMST is requesting that the court make an *in specie* salvage award, thereby transferring title to all of the artifacts in lieu of holding a judicial sale to satisfy the salvor's lien. While the court has the discretion to make such an award where the value of the salvaging services equal or exceed the amount that could be recovered through judicial sale of the rescued property, the court is under no obligation to do so; it is entirely a matter of the court's discretion. *See, e.g., Titanic 2002,* 286

F.3d at 194 ("In lieu of a sale to foreclose the salvage lien, the court *could* simply convey title ... essentially providing RMST what is analogous to a 'deed in lieu of foreclosure.'") (emphasis added); *Haver,* 171 F.3d 943, 966 ("If it becomes apparent to the court that the proceeds of any sale would clearly be inadequate to pay the salvor its full reward, then the court might, as a matter of discretion, award the salvor title to the property in lieu of the proceeds of sale, thus saving the costs of sale."). As the court stated at the May 17, 2004 hearing, it is not inclined to exercise its discretion to make an *in specie* award of the artifacts following the October, 2004 hearing, in part because doing so would permit RMST to disperse the artifacts at will, contrary to all previous restrictions of the court and representations of RMST. (*See* Tr. of Proceedings, May 17, 2004, at 18–19.)

**18.** *See supra* note 12.

comity, and RMST will not be permitted to present evidence at the October 18, 2004 hearing for the purpose of arguing that it should be awarded title to the Titanic artifacts under the law of finds. On October 18, 2004, a hearing will begin on the amount of RMST's salvage award, and shall proceed as set forth above. The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Order to RMST's counsel and to the Assistant United States Attorney.

**IT IS SO ORDERED.**[19]

*Opinion Index*

I. *Factual and Procedural History* .........................................726

II. *Analysis* ...................................................................730
 A. *Recognition of the 1993 Procès–Verbal* ..............................730
 1. Recognition of Foreign Law .......................................731
 2. The Administrator Lacked Authority Under French Law to Award Title to the 1987 Artifacts Without Making Factual Findings Regarding the Cost of the Salvage Service and the Value of the Saved Property ...................................................732
 (a) French Laws Applicable to Salvaged Wrecks ....................732
 (b) Legal Procedures Employed in Reaching the 1993 Procès– Verbal ..................................................732
 3. Recognition of the Procès–Verbal Would Be Contrary to United States Public Policy ...........................................733
 B. *RMST Will Not Be Permitted to Present Evidence and Argue that it Should Be Awarded Title to the Artifacts Under the Law of Finds* .....734
 1. The Law of Finds and The Law of Salvage .........................735
 2. RMST's Continuing Status as Salvor–in–Possession Precludes Application of the Law of Finds to the 5,900 Artifacts ...............735
 3. The Doctrine of Judicial Estoppel Would Bar RMST from Arguing that it had the Requisite Intent to Own the Artifacts .....737
 (a) The Doctrine of Judicial Estoppel ...............................738
 (b) Application of the Doctrine to RMST's Finds Claim ..............738
 (1) RMST Previously Asserted a Factual Position Inconsistent With an Award of Title Under the Law of Finds for the Purpose of Retaining its Salvor–in–Possession Status ..........................................................739
 (2) The Court Relied Upon and Was Persuaded by RMST's Representations ........................................740
 (3) Permitting RMST to Argue Now that it Had the Requisite Intent to Own the 5,900 Artifacts Already Recovered Would Give it a Significant Unfair Advantage .....740

III. *The October 2004 Hearing* ..............................................741
 A. *Determining Salvage Awards* .......................................742
 B. *Application to the October 18, 2004 Hearing* .......................743

IV. *Conclusion* ...............................................................744

**19.** An index of this Memorandum Opinion and Order is attached for reference purposes and made a part hereof.