**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

R.M.S. TITANIC, INCORPORATED,
successor in interest to Titanic
Ventures, limited partnership,
                    *Plaintiff-Appellant,*

v.

THE WRECKED AND ABANDONED
VESSEL, its engines, tackle, apparel,
appurtenances, cargo, etc., located
within one (1) nautical mile of a
point located at 41 43′32″ North
Latitude and 49 56′49″ West
Longitude, believed to be the RMS
Titanic, *in rem*,

                         *Defendant.*

⎱
⎰  No. 04-1933

UNIVERSITY OF VIRGINIA APPELLATE
LITIGATION CLINIC,
                    *Amicus Curiae,*

ALAIN DE FOUCAUD,
        *Amicus Supporting Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Rebecca Beach Smith, District Judge.
(CA-93-902-N)

Argued: October 26, 2005

Decided: January 31, 2006

Before WILKINS, Chief Judge, and NIEMEYER and
KING, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Niemeyer wrote the opinion, in which Chief Judge Wilkins and Judge King joined.

---

## COUNSEL

**ARGUED:** David Jeremy Bederman, EMORY UNIVERSITY SCHOOL OF LAW, Atlanta, Georgia, for Appellant. Neal Lawrence Walters, Charlottesville, Virginia, for Amicus Curiae. **ON BRIEF:** J. Ridgely Porter, III, Matthew D. Pethybridge, CARR & PORTER, L.L.C., Portsmouth, Virginia, for Appellant. John Paul Jones, UNIVERSITY OF RICHMOND, Richmond, Virginia, for Alain de Foucaud, Amicus Supporting Appellant.

---

## OPINION

NIEMEYER, Circuit Judge:

For over ten years, R.M.S. Titanic, Inc. ("RMST") has functioned as the exclusive salvor-in-possession of the wreck of the *R.M.S. Titanic*, which lies in international waters. In a motion filed on February 12, 2004, RMST requested that the district court enter an order awarding it "title to all the artifacts (including portions of the hull) which are the subject of this action *pursuant to the law of finds*" (emphasis added) or, in the alternative, a salvage award in the amount of $225 million. RMST excluded from its motion any claim for an award of title to the 1,800 artifacts retrieved from the *Titanic* in 1987 and taken to France — well before this *in rem* action was commenced — asserting that a French administrative agency had already awarded it title to those artifacts. But it did request that the district court declare that, based on the French administrative action, "the artifacts raised during the 1987 expedition are independently owned by RMST."

Following a hearing, the district court entered an order dated July 2, 2004, in which it (1) refused to grant comity and recognize the decision of a French administrator awarding RMST title to the 1987

artifacts, and (2) rejected RMST's claim that it should be awarded title to the artifacts recovered since 1993 under the maritime law of finds. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel . . . believed to be the R.M.S. Titanic*, 323 F. Supp. 2d 724, 744-45 (E.D. Va. 2004).

On RMST's appeal from the district court's order, we conclude that the district court lacked *in rem* jurisdiction over the 1987 artifacts or other jurisdiction to declare the right to title in the 1987 artifacts, and therefore we vacate that part of the court's July 2, 2004 order which relates to those artifacts. Otherwise we affirm. In remanding this case to the district court, we also recognize explicitly the appropriateness of applying maritime salvage law to historic wrecks such as the *Titanic*.

I

The *R.M.S. Titanic* sank in 1912 in the North Atlantic, where the ocean is over 12,000 feet deep, and not until 1985 was the site of the wreck discovered.

Beginning in 1987, a joint American-French expedition, which included the predecessor of RMST, began salvage operations and, during 32 dives, recovered approximately 1,800 artifacts (the "1987 artifacts") which were taken to France for conservation and restoration. In 1993, a French administrator in the Office of Maritime Affairs of the Ministry of Equipment, Transportation, and Tourism awarded RMST's predecessor title to the artifacts.

This *in rem* action was commenced on August 26, 1993, against artifacts recovered from the *Titanic* in dives in 1993 and against the *Titanic* itself. Several months later, the district court issued an order declaring RMST salvor-in-possession of the artifacts that had been brought to the Eastern District of Virginia, as well as of the wreck itself and artifacts not yet retrieved from the wreck. Over the years since, there have been numerous district court opinions and two opinions from our court relating to the salvage operations.[1]

---

[1]See *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel . . . believed to be the R.M.S. Titanic*, 286 F.3d 194 (4th Cir. 2002), *cert. denied*, 537

On June 18, 2003, RMST filed a motion to set this case for trial and take evidence "as to whether or not the law of finds and/or the law of salvage would apply, to determine whether the *R.M.S. Titanic* was a lost and abandoned vessel, and/or to make a liberal salvage award to plaintiff for its efforts expended in this case." In response, the district court observed that there were no adverse parties "currently involved in the case" and there are "no pending issues before the court for trial." Accordingly, the court denied the motion to set the case for trial. But the court allowed RMST to petition the court for a salvage award or a change in its status by filing a motion.

Following the court's invitation, RMST filed a "Motion for Salvage and/or Finds Award." In its motion, RMST requested an award of title "to all the artifacts (including portions of the hull) which are the subject of this action pursuant to the law of finds," or, in the alternative, a "liberal salvage award" in the amount of $225 million for salvage operations conducted since 1993. RMST claimed that since the cost of salvage has exceeded the value of artifacts recovered from the *Titanic*, the artifacts should be granted to RMST as an *in specie* salvage award. In its motion, RMST explicitly excluded from its requests any relief with respect to the 1987 artifacts, title to which a French administrator transferred to RMST. In addition, it sought an affirmative ruling from the district court that "the artifacts raised during the 1987 expedition are independently owned by RMST." In respect to that request, RMST filed a "Notice of Intent to Raise Issues Concerning the Law of Foreign Countries" on May 14, 2004, praying that the district court, as a matter of comity, recognize the 1993 French administrator's decision granting RMST title to the 1987 artifacts.

---

U.S. 885 ("*Titanic II*"); *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943 (4th Cir. 1999) ("*Titanic I*"); *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel . . . believed to be the R.M.S. Titanic*, 327 F. Supp. 2d 664 (E.D. Va. 2004); *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel . . . believed to be the R.M.S. Titanic*, 323 F. Supp. 2d 724 (E.D. Va. 2004); *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel . . . believed to be the R.M.S. Titanic*, 9 F. Supp. 2d 624 (E.D. Va. 1998); *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel . . . believed to be the R.M.S. Titanic*, 924 F. Supp. 714 (E.D. Va. 1996); *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel . . . believed to be the R.M.S. Titanic*, 920 F. Supp. 96 (E.D. Va. 1996).

By a memorandum and order dated July 2, 2004, the district court refused to recognize the French administrator's decision awarding RMST title to the 1987 artifacts and rejected RMST's claims to title of all artifacts under the law of finds, concluding that such relief would be inconsistent with RMST's continuing role as salvor-in-possession of the *Titanic*. *R.M.S. Titanic*, 323 F. Supp. 2d at 744-45. The court also scheduled a hearing for October 18, 2004, to determine the amount of an appropriate salvage award. *Id.* at 745. When RMST filed this interlocutory appeal from the district court's order, the court issued a stay pending our decision. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel . . . believed to be the R.M.S. Titanic*, 327 F. Supp. 2d 664, 665-66 (E.D. Va. 2004).

Because there was no party in opposition to RMST to represent the position of the district court on appeal, we invited the University of Virginia School of Law's Appellate Litigation Clinic to file an *amicus* brief to serve as the answering brief. The Clinic has again performed a valuable service and helped to maintain the adversarial process.

## II

As a threshold matter, the *amicus* challenges our jurisdiction to review the district court's July 2, 2004 order because that order was interlocutory. RMST claims that appellate jurisdiction is conferred by 28 U.S.C. § 1292(a)(3) (authorizing appeals of interlocutory decrees "determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed"). The question thus arises whether the district court, in its July 2, 2004 order, determined the "rights and liabilities" of RMST when the court (1) implicitly asserted *in rem* jurisdiction over the 1987 artifacts and denied comity to the 1993 French Administrator's decision, and (2) held that RMST is barred from seeking title to artifacts under the law of finds.

As a general proposition, jurisdiction of courts of appeals is limited by the finality requirement expressed in 28 U.S.C. § 1291, which provides that courts of appeals "shall have jurisdiction of appeals from all *final decisions* of the district courts of the United States" (emphasis added). The rule of finality "is an important component of the judicial structure, for . . . it prevents the entanglement of the district and appellate courts in each other's adjudications in an unruly and ulti-

mately inefficient way." *Evergreen Int'l (USA) Corp. v. Standard Warehouse*, 33 F.3d 420, 423 (4th Cir. 1994). But there are numerous exceptions to the general rule based on overriding policy considerations. In enacting § 1292(a)(3), Congress provided an exception in the admiralty context. As the Eighth Circuit has explained:

> In admiralty, trials were traditionally bifurcated. First there would be a trial before the court on the issue of liability. If there was a finding of liability, there would then be a separate hearing before a special master to ascertain damages. These damages hearings were often both lengthy and costly. Congress intended 28 U.S.C. § 1292(a)(3) to permit parties to appeal the finding of liability on the merits, before undergoing the long, burdensome, and perhaps unnecessary damages proceeding.

*City of Fort Madison v. Emerald Lady*, 990 F.2d 1086, 1089 (8th Cir. 1993) (citation omitted); *see also* 16 Charles Alan Wright et al., *Federal Practice & Procedure* § 3927 (1996). And we have repeatedly affirmed this understanding of § 1292(a)(3). *See Evergreen*, 33 F.3d at 424 (noting that "[t]his understanding of the statute's purpose is universal"); *Medomsley Steam Shipping Co. v. Elizabeth River Terminals, Inc.*, 317 F.2d 741, 742 (4th Cir. 1963); *South Carolina State Highway Dep't v. The Fort Fetterman*, 236 F.2d 221, 227 (4th Cir. 1956) ("That statute [the predecessor to § 1292(a)(3)] was primarily intended to avoid the expense and delay of a reference to compute damages") (quoting with approval *The Maria*, 67 F.2d 571 (2d Cir. 1933)). Furthermore, we have joined other circuits in tending to construe § 1292(a)(3) narrowly and applying it to cases that present the "special circumstances that justified its inception." *Evergreen*, 33 F.3d at 424-25 (collecting cases).

The *amicus* contends that the district court did not determine RMST's rights and that the "special circumstances" contemplated under § 1292(a)(3) are not present in this case because (1) the denial of comity to the 1993 French decision does not prevent RMST from presenting alternative evidence to establish its claim of title to articles recovered from the *Titanic*, and (2) the rejection of RMST's claims under the law of finds does not preclude the possibility of remuneration, as RMST may still obtain a liberal salvage award. The *amicus*

argues that even if the district court committed error in its July 2, 2004 order, this court can address the error after all of RMST's claims have been adjudicated.

Because the *amicus* has also suggested that § 1292(a)(3) might not apply to salvage cases at all, we begin with our conclusion that this is a "distinctively maritime" case concerning a unique and long-running salvage operation. As such, it not only "falls within the 'admiralty' docket," but it also has a "distinctly maritime air." *Evergreen*, 33 F.3d at 425. In contrast with *Evergreen*, in which the matter on interlocutory appeal involved general contract interpretation having nothing to do with admiralty law, this case falls squarely within the maritime jurisdiction. *See Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked & Abandoned Steam Vessel*, 833 F.2d 1059, 1064 (1st Cir. 1987) (noting "solid precedential support" for maritime jurisdiction "because the case involves, principally, a claim of salvage rights"); *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 640 F.2d 560, 566 (5th Cir. 1981).

On the question whether the district court's ruling falls within the traditional profile of cases anticipated in § 1292(a)(3)'s enactment, we agree with the *amicus* that this is not the prototypical case in which liability and damages are bifurcated. But the district court's order does amount to a ruling on all "liability" issues, leaving open only the *amount* of RMST's salvage award. The district court determined that the 1987 artifacts are indeed part of this proceeding, rejecting a request of comity for the 1993 French administrative decision; that salvage law, not finds law, continues to apply to this case; and that a hearing be scheduled to determine the amount of any salvage award. These rulings effectively bifurcated this salvage proceeding in a manner that is closely analogous to the "special circumstances" justifying the exception stated in § 1292(a)(3).

Before calculating a salvage award, a court must consider any claims of ownership. If a party has a legitimate claim to title, no salvage award proceeding is necessary. Insofar as a decision by this court might render that process partly or wholly unnecessary, our exercise of jurisdiction under § 1292(a)(3) fulfills Congress' intent to

promote judicial economy in admiralty courts by avoiding costly litigation concerning damage awards.

Accordingly, we conclude that this matter comes within the exception created by 28 U.S.C. § 1292(a)(3) and that therefore we have jurisdiction to hear this interlocutory appeal.

III

RMST contends first that the district court erred in refusing to "grant comity" to a French administrator's decision granting Titanic Ventures Limited Partnership ("Titanic Ventures") (a Connecticut limited partnership and RMST's predecessor) title to the 1,800 artifacts recovered from the *Titanic* in 1987. These artifacts were retrieved during a joint expedition conducted by Titanic Ventures, working in conjunction with and under a charter agreement with the Institut Français de Recherche Pour l'Exploitation de la Mer, the French government's oceanographic institution. The 1987 artifacts were taken to France for conservation and restoration.

In the fall of 1993, Titanic Ventures sought and obtained from the Office of Maritime Affairs (Ministry of Equipment, Transportation, and Tourism) for France an award of title to the 1987 artifacts. In a letter to the head of Maritime Affairs of Lorient, Titanic Ventures stated that the 1987 expedition to retrieve artifacts had been completed and that it wished to own those 1987 artifacts that were not claimed by third parties following legal publication. Titanic Ventures also made a commitment in the letter that "the artifacts will only be used [for] a cultural purpose and will not, therefore, be part of any operations which would lead to their dispersion, but to the exception of exhibition purposes, and none of the artifacts will be sold."

An administrator in the Office of Maritime Affairs responded, in a letter dated October 12, 1993, that because no one had made any claims pursuant to publication, ownership of the artifacts "shall be delivered to the company Titanic Ventures Limited Partnership, as salvager, in accordance with the provisions of Article 13 of Decree No. 61-1547 of December 26, 1961, instituting the system governing wreckages."[2] The Administrator's decision also incorporated Titanic

---

[2] Article 13 of the 1961 Decree provides: "The Head of the Headquarters of Maritime Affairs may remit to the salvor, as his property, all salvage of little value which would produce no appreciable amount at sale."

Ventures' assurances made in its September 22, 1993 letter, stating that "[Titanic Ventures] agreed to make use of such objects in conformity with the respect due the memory of their initial owners and to not carry out any commercial transaction concerning such objects nor any sale of any one of them nor any transaction entailing their dispersion, if not for the purposes of an exhibition." On October 20, 1993, the Administrator declared in formal minutes of the transaction (a "procès-verbal") that he "has carried out this day the delivery of artifacts recovered from the *Titanic* wreck in 1987," listed in an attached exhibit, in accordance with Titanic Ventures' letter dated September 22, 1993.

RMST now argues that the district court's refusal to "grant comity" to this transfer of title was based on conclusions "contrary to settled law and that the district court improperly substituted its judgment as to the requirements of French law." It argues that in any event, the 1987 artifacts are not part of this case, a fact that it claims the district court earlier recognized.

In refusing to recognize the French administrator's decision to award the 1987 artifacts to Titanic Ventures, the district court concluded that an application of the principles of international comity did not justify the district court's recognition of the French administrative proceeding, relying on *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895); *Jaffe v. Accredited Surety & Casualty Co.*, 294 F.3d 584, 591 (4th Cir. 2002); and *Somportex, Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1972). The district court concluded that the delivery of the 1987 artifacts did not result from "a full and fair adversary proceeding *before a court*"; that the French Administrator of Maritime Affairs "clearly lacked authority to award title to the 1987 artifacts under the provision of the French law he cited"; and that the transfer would be "contrary to United States public policy," referring particularly to the *R.M.S. Titanic* Maritime Memorial Act of 1986, 16 U.S.C. § 450rr *et seq.*, and regulations under it, 66 Fed. Reg., 18905-18912 (Apr. 12, 2001).

In reaching its conclusions, the district court implicitly concluded that it had *in rem* jurisdiction over the 1987 artifacts or jurisdiction to issue a declaratory judgment as to them. This is manifested not only by the court's ruling refusing to grant comity to the French deci-

sion but also by its direction to RMST to submit evidence as to the value of all 5,900 artifacts in RMST's possession, including the 1,800 recovered in 1987, and its indication that it "may have to take delivery of the 5,900 artifacts," depending on the outcome of the salvage proceeding. *See R.M.S. Titanic*, 323 F. Supp. 2d at 744. We conclude, however, that the district court did not have *in rem* jurisdiction over the 1987 artifacts or, absent *in rem* jurisdiction, any other jurisdictional basis upon which to issue a declaratory judgment.

In August 1993, at the time that this *in rem* action was commenced, the 1987 artifacts had already been separated from the *Titanic* and transported to France. While Titanic Ventures did not commence a salvage action there, it did seek title to the 1987 artifacts through an administrative order. In commencing this *in rem* action, however, RMST relied on artifacts retrieved from a *second* expedition conducted in 1993, bringing those artifacts physically to the Eastern District of Virginia. It relied on a few artifacts presented to the court to assert that the court had constructive possession of the remaining 1993 artifacts, which were physically located in the district. It also relied on these artifacts to invoke the district court's *in rem* jurisdiction over the wreck of the *R.M.S. Titanic*. Thus, it appears that the 1987 artifacts, which were in France, were not part of the *res* over which the district court could assert *in rem* jurisdiction. The 1987 artifacts had been removed from the *Titanic* some six years earlier and taken to France. This simple historical fact seems to have been confirmed by the district court and counsel in December 1993, when the court conducted a hearing a few months after this case was commenced:

Mr. Stillman [counsel for RMST]:

> The French government through the Ministry of the Sea published notice in French embassies and newspapers internationally with the inventory of the artifacts that came up after the 32 dives in 1987. That process culminated in one claim internationally made to a business card that was brought up in 1987. That card is being held out of the artifacts. The rest of them have been given to R.M.S.

> Titanic, successor in interest to Titanic Ventures, so our client owns and has title to all of the 1987 artifacts pursuant to that French administrative proceeding but for the one card, and that order, which you have four pages. Your Honor, you have the French and the English.

The Court: That's subject to the unresolved claims of the insurance company?

Mr. Stillman: Well, your Honor, the 1987 artifacts are not part of the present dispute.

The Court: Not part of the present dispute, you are right.

Mr. Stillman: Yes sir.

Because the 1987 artifacts were not in the Eastern District of Virginia; because they were not named as the *in rem* defendant in this case; and because they were not otherwise voluntarily subjected to the jurisdiction of the district court, the district court did have not *in rem* jurisdiction over them. To exercise *in rem* jurisdiction over a *res*, the court must have the *res* within its jurisdiction. *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 964 (4th Cir. 1999) ("*Titanic I*"); *see* 29 Moore's Federal Practice § 710.08 (3d ed. 2005); Fed. R. Civ. P. Supp. R. E(3). The court must take either possession or control over the property before it can "adjudicate rights in it that are binding against the rest of the world." *Titanic I*, 171 F.3d at 964. When a court has only part of the *res* in its custody, it may nonetheless have "constructive possession" over other parts of the *res* in its district. *Id.* For example, in this *in rem* action, RMST presented the district court with a wine decanter recovered from the *Titanic* and with evidence that the other 1993 artifacts were physically present within the Eastern District of Virginia. Based on the fact that the 1993 artifacts were in Virginia, the court issued a warrant ordering their arrest. Relying on the court's constructive possession of the artifacts located in the Eastern District of Virginia, the court also purported to arrest the entire wreck of the *Titanic* and likewise the artifacts *yet* to be removed from it. *Id.* at 952.

In reviewing earlier the district court's exercise of jurisdiction, we noted that the "propriety of exercising *in rem* jurisdiction over an entire shipwreck *within the court's territorial jurisdiction* when only one part of that wreck is actually presented to a court rests upon the fiction that the *res* is not divided and that therefore possession of some of it is *constructively possession* of all." *Id.* at 964 (emphasis added). When a ship lies outside the district court's territorial jurisdiction, however, we developed a notion of "constructive *in rem* jurisdiction" for application to particular circumstances of this case. As we explained:

> We hasten to add that as we use the term "constructive," we mean an "imperfect" or "inchoate" *in rem* jurisdiction which falls short of giving the court sovereignty over the wreck. It represents rather a "shared sovereignty," shared with other nations enforcing the same *jus gentium*. Through this mechanism, internationally recognized rights may be legally declared but not finally enforced. Final enforcement requires the additional steps of bringing either party or persons involved before the district court or a court of admiralty of another nation.

*Id.* at 967-68. But we did not purport to define a constructive *in rem* jurisdiction over personal property located within the sovereign limits of other nations.

It is apparent when considering these principles that the district court did not have constructive *possession* of the 1987 artifacts to give it *in rem* jurisdiction over them because the 1987 artifacts had already been separated from the wreck and taken to France. Moreover, it did not have constructive *in rem jurisdiction* over those artifacts because constructive *in rem* jurisdiction applied only to the *Titanic* wreck lying in international waters.

Absent *in rem* jurisdiction, there is no other jurisdictional basis upon which the court could declare the rights to the 1987 artifacts located in France. Until RMST is able to identify a person or entity against whom to seek a declaratory judgment and obtain personal jurisdiction over that person or entity, no jurisdiction could exist. Indeed, no case or controversy exists. RMST cannot come to a court

in the United States and simply assert that the court should declare rights against the world as to property located in a foreign country.

Accordingly, to the extent that the district court's July 2, 2004 order addresses the 1987 artifacts, we vacate it.

IV

RMST's principal contention is that the district court erred in denying it the opportunity of presenting evidence to justify awarding it title to the artifacts under the law of finds, effectively changing its role from that of "salvor-in-possession" to that of "finder" with respect to the artifacts at issue in this case. RMST expressed the desire, however, to continue to serve as salvor-in-possession when retrieving artifacts. The district court denied RMST the opportunity to present such evidence. After outlining the long ten-year history under which RMST operated as salvor-in-possession under the protection of numerous court orders, the court explained:

> Simply put, RMST cannot have its cake and eat it too. RMST asks the court to apply the law of finds to artifacts already in its possession so that it can be awarded title to those artifacts, but the company wants the law of salvage to apply to the as-yet unrecovered artifacts in and surrounding the *Titanic* wreckage so that RMST, as salvor-in-possession, can retain its exclusive right to reduce those artifacts to actual possession.

> The common law of finds and the maritime law of salvage, however, cannot be simultaneously applied to a shipwreck and property recovered from that shipwreck. The doctrines serve different purposes and promote different behaviors.

*R.M.S. Titanic*, 323 F. Supp. 2d at 736-37. The court concluded:

> Because it would be inequitable and inconsistent to award a party both the exclusive right to recover objects on the premise that the recovery is being performed for the benefit

of the objects' owners, and to award title to the objects once they are recovered on the premise that they were previously unowned, the laws of finds and salvage cannot simultaneously be applied to a shipwreck and to personalty already recovered from that shipwreck.

*Id.* at 737.

We begin our treatment of RMST's contention by agreeing with the district court that the law of salvage and the law of finds "serve different purposes and promote different behaviors." *Id.* at 736; *see also Hener v. United States*, 525 F. Supp. 350, 354-59 (S.D.N.Y. 1981). The law of salvage, which has been applied to this case until now, has a favored, indeed a dignified, place within the law of nations or the *jus gentium*. The law of finds, however, is a disfavored common-law doctrine rarely applied to wrecks and then only under limited circumstances.

As we have previously described the principles of salvage in this case, *see Titanic I*, 171 F.3d at 961-64; *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel . . . believed to be the R.M.S. Titanic*, 286 F.3d 194, 202-07 (4th Cir. 2002) ("*Titanic II*"), the law of salvage gives potential salvors incentives to render voluntary and effective aid to people and property in distress at sea, *see Titanic I*, 171 F.3d at 962. Without some promise of remuneration, salvors might understandably be reluctant to undertake the often dangerous and costly efforts necessary to provide others with assistance. *See id.* ("Absent the promise of compensation and reward, we question whether a party, even one with the capacity to save the *Titanic* itself would incur the costs to do so"). For thousands of years, maritime law has acknowledged the need to reward those who freely accept the responsibility of rescuing lives and property at sea. *See id.*; 3A *Benedict on Admiralty* § 5, at 1-1 (7th ed. 2005) ("Marine salvage has been a recognized part of commercial transportation almost from the time when seafarers sailed their vessels out of safe harbors and ventured forth upon the sea").

To secure payment of the salvage award, the law gives salvors a maritime lien on the salved property. *Titanic I*, 171 F.3d at 963. The lien attaches to the exclusion of all others, including other potential

salvors as well as the property's true owner. *See id.*; *Amstar Corp. v. S/S Alexandros T.*, 664 F.2d 904, 908-09 (4th Cir. 1981). Even as the salvor is given this limited possessory interest in the salved property, the true owner is not divested of title to the property. As we have stated,

> It is critical to note that under salvage law, the salvor receives a lien in the property, not title to the property, and as long as the case remains a salvage case, the lienholder cannot assert a right to title even though he may end up with title following execution or foreclosure of the lien.

*Titanic II*, 286 F.3d at 204-05.

In addition to the maritime lien that attaches to salved property, a court may grant a salvor the status of exclusive salvor-in-possession over property that has yet to be recovered and may issue an injunction to enforce that status. *See Treasure Salvors*, 640 F.2d at 567 ("Among the most important of these [salvage] rights [is] the right to exclude others from participating in the salvage operations, so long as the original salvor appears ready, willing and able to complete the salvage project").

Along with granting salvor-in-possession status, the law imposes on salvors the "duties of good faith, honesty, and diligence in protecting the property in [the] salvors' care." *Titanic I*, 171 F.3d at 964. Because a salvor acts on behalf of a true owner, even when that owner has not been identified, it serves as a trustee of the owner's property and is therefore not permitted to use that property for its own purposes. Consistent with trust-law principles, when the salvor violates that trust, it may forfeit its salvage rights, including the right to exclusive possession and a salvage award. *Id.* at 964.

In stark contrast to the nature and purpose of salvage law, which is an ancient and time-honored part of the maritime *jus gentium*, the law of finds is a disfavored common-law doctrine incorporated into admiralty but only rarely applied. The law of finds expresses the acquisitive principle of "finders, keepers" — namely, that the first finder obtains title over unowned property that it has reduced to its

possession.[3] Traditionally, in admiralty, that principle was applied only to objects found in the state of nature, such as marine flora and fauna, that were never previously owned and could thus be reduced to possession by an original "finder." 3A *Benedict on Admiralty* § 158, at 11-16. More recently, the doctrine has been applied to long-lost and abandoned shipwrecks, which, having once been owned, are no longer the property of anyone and so revert to the state of nature. *See Hener*, 525 F. Supp. at 354 ("The common law of finds treats property that is abandoned as returned to the state of nature and thus equivalent to property, such as fish or ocean plants, with no prior owner").

Courts, however, have traditionally presumed that when property is lost at sea, title remains with the true owner, regardless of how much time has passed. *See Columbus-America Discovery Group v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 461 (4th Cir. 1992) ("Once an article has been lost at sea, 'lapse of time and nonuser [sic] are not sufficient, in and of themselves, to constitute an abandonment'") (quoting *Wiggins v. 1100 Tons, More or Less, of Italian Marble*, 186 F. Supp. 452, 456 (E.D. Va. 1960)). We have noted only two types of maritime cases in which the presumption against abandonment is overcome: first, those in which property owners expressly relinquish title; and second, those where "items are recovered from ancient shipwrecks and no owner appears in court to claim them." *Columbus-America*, 974 F.2d at 461; *see also Adams v. Unione Mediterranea Di Sicurta*, 220 F.3d 659, 671 (5th Cir. 2000); *Martha's Vineyard*, 833 F.3d at 1065. The presumption that property lost at sea is not abandoned is based on fundamental notions of property that underlie admiralty's policy favoring the law of salvage over the law of finds. *See Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63, 74 (2d Cir. 1998).

To apply the law of finds other than to the most exceptional of circumstances would promote behavior fundamentally at odds with the principles of mutual aid which underlie salvage law. In an oft-cited opinion, Judge Sofaer explained:

---

[3]To establish a claim under the law of finds, a finder must show (1) intent to reduce property to possession, (2) actual or constructive possession of the property, and (3) that the property is either unowned or abandoned. *See Hener*, 525 F. Supp. at 356.

These rules [of finds law] encourage certain types of conduct and discourage others. A would-be finder should be expected to act acquisitively, to express a will to own by acts designed to establish the high degree of control required for a finding of possession. The would-be finder's longing to acquire is exacerbated by the prospect of being found to have failed to establish title. If either intent or possession is found lacking, the would-be finder receives nothing; neither effort alone nor acquisition unaccompanied by the required intent is rewarded. Moreover, if the property is ultimately found not to have been abandoned the law of finds permits no reward, even for efforts to recover the property that have been partly or completely successful. Furthermore, success as a finder is measured solely in terms of obtaining possession of specific property; possession of specific property can seldom be shared, and mere contribution by one party to another's successful efforts to obtain possession earns no compensation.

*Hener*, 525 F. Supp. at 356 (internal citation omitted). Thus, under a regime where the law of finds were to be applied freely, one who would come upon a lost ship on the high seas would be encouraged to refrain from attempting to save it and to entertain the idea of taking the valuable cargo for himself as a finder. Indeed, a free finders-keepers policy is but a short step from active piracy and pillaging. How long after a ship runs aground would it take under a free finders-keepers policy before scavengers would be crawling over the wreck for property to deprive the owner of his property rights? Because of this tendency to encourage acquisitive behavior, the law of finds is applied sparingly — only when no private or public interest would be adversely affected by its application.

In this case, to change RMST's role from that as salvor-in-possession to that as finder would be momentous. *First*, RMST would no longer be the trustee of the property that it has salvaged, becoming the owner of the very property that had been placed in its trust by court orders. This breach of the trust relationship would do violence to basic notions of trust law, *see, e.g.*, Restatement (Second) of Trusts §§ 169-176 (1959) (describing duties of trustees), and work an injustice to those who had earlier sought unsuccessfully to be salvors, *see,*

*e.g.*, *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel . . . believed to be the R.M.S. Titanic*, 924 F. Supp. 714, 716 (E.D. Va. 1996). *Second*, as RMST became finder of the artifacts, court supervision of them would end, and RMST could do what it wished with the property it recovered, despite its earlier promises, which might become difficult to enforce. *Finally*, such a ruling would open the way to justified claims of unfairness by other would-be finders who are excluded from the wreck site. Urging a consistent application of finds to artifacts and the wreck, these would-be finders would participate in an unsupervised rush to the site to recover anything that could be grabbed, without regard to the site, the remains, to potential claims of ownership by descendants of original owners, and to historical, archeological, and cultural interests.

Moreover, there are the facts that appropriately prompted the district court to apply notions of estoppel to the circumstances of this case: *First*, even though RMST pleaded its complaint in the alternative, alleging a right to *possession* of the property recovered as salvor-in-possession or to *title* to the property, *see* Fed. R. Civ. P. 8(a) ("Relief in the alternative or of several different types may be demanded"), RMST has pursued this case from the beginning as a salvor-in-possession to preserve the property either for the owners or for the historic and cultural interest of the public. Based on its representations and promises, the district court granted RMST an injunction that excluded the world from the site and from RMST's efforts to retrieve artifacts. *Second*, the district court continued to make rulings that protected RMST on the assumption that RMST was acting as a trustee for the artifacts under court supervision for the benefit of the owners or the public. *Third*, RMST's promises and actions to protect the site and the artifacts has instilled in the public conscience reliance and actions that might, in the absence of such promises and actions, have taken a different form. For example, Congress has enacted law about the *Titanic* that was only advisory, *see* 16 U.S.C. § 450rr *et seq.*, thus respecting the salvage operation.

Finally, as a legal matter, we are unaware of any court that has awarded salvage-in-possession status to a salvor and, after years of supervision, changed the salvor's role to that of finder, even though we have recognized in the abstract the legal possibility of this occur-

ring under different circumstances. *See, e.g.*, *Titanic II*, 286 F.3d at 205; *Columbus-America*, 974 F.2d at 461-65.

RMST nonetheless maintains that because it is proper to plead alternatively a right to possession in its salvage role and a right to title in a finder role, it should be allowed to pursue either or both claims. To hold otherwise, RMST argues, would present it with a "Hobson's choice": either file as a finder, and risk receiving no award from a potential divestiture of title on the appearance of a true owner; or file as a salvor, and risk receiving no award should the property be found abandoned and no owner existed to pay the award.

Nothing we have said contradicts RMST's right to plead in the alternative as authorized by Federal Rule of Civil Procedure 8(a). What we have concluded is that a salvor, who has accepted the role of salvor-in-possession and obtained benefits under that role for a period of ten years under the protection of the court, may not then seek to convert its role to finder in order to obtain title to the artifacts under the law of finds while remaining a salvor-in-possession as to the wreck site. *See Titanic II*, 286 F.3d at 205 ("[A]s long as the case remains a salvage case, the lienholder cannot assert a right to title even though he may end up with the title following execution or foreclosure of the lien"). RMST has cited no case in which a party who was declared a salvor-in-possession with respect to recovered property was later declared a finder under the law of finds. The barrier to converting RMST's role is not a barrier in pleading procedure; it derives from an inconsistency in the performance of the two roles in the circumstances of this case.

Moreover, RMST's substantive argument that it faces a Hobson's choice is legally without merit. It suggests that it must guess the proper route as between pursuing salvage rights or asserting finders' rights, at the risk of no award. The law, however, does not suggest such an either-or risk. Under finds, RMST would effectively receive an award in the value of what it reduced to possession, and under salvage it would also be assured an award from the value of what it reduced to possession. Indeed, if the value of property salvaged were insufficient to cover an appropriate salvage award, then the court could, after making appropriate findings, even grant an *in specie* award to the salvor. *Titanic II*, 286 F.3d at 204 (discussing various

methods of discharging salvage liens). Thus, a salvor-in-possession is not unfairly disadvantaged by being denied the opportunity to pursue simultaneously an award of title under the law of finds.

RMST also argues that the district court erred in assuming that a party seeking title under the law of finds cannot also maintain a claim for exclusive possession under the law of salvage for the actual recovery operations. The district court held that it would be unfair to permit a salvor in possession to become a "finder," because a salvor is entitled to exclusive possession, whereas a finder is not. As the court stated, "[I]f the law of finds is being applied to award title to the first party that can demonstrate both 'possession' under finds law and an intent to own abandoned property, then the court does not have the authority to prohibit others from also attempting to recover the abandoned property." *R.M.S. Titanic*, 323 F. Supp. 2d at 736-737. A finder cannot exclude others from their attempts to obtain first possession of artifacts recovered from an abandoned wreck. For that reason, the district court held that RMST cannot claim to be a finder and, at the same time, seek to exclude the rest of the world from salvaging the wreck or reducing its artifacts to possession under finds law. As the court characterized its reasoning, "RMST cannot have its cake and eat it too." *Id.* at 735.

Even were we to recognize the concept of an exclusive *finder*-in-possession for a wreck, which we do not, RMST has never asserted itself as one. There is nothing in the record to suggest that RMST ever requested injunctive relief to exclude others from interfering with its efforts to obtain title to the artifacts. To the contrary, RMST has repeatedly represented to the district court and this court that it was the exclusive *salvor-in-possession* of the *Titanic*. For example, in proceedings related to the June 1994 order granting RMST status as salvor-in-possession, "the parties expressed their unequivocal intent that RMST's role be that of salvor, not finder." *Titanic II*, 286 F.3d at 207. With respect to RMST's position at that time, we observed that "RMST has never argued that the *Titanic* had been abandoned and that it was entitled to the entire ship and the artifacts from it, as would be required if this case progressed under the law of finds." *Id.*

Moreover, had RMST made such a request, the district court would have summarily denied it because RMST would be illegitimately

transposing a right to exclude others during salvage operations into a right to exclude others when attempting to become a finder under the finds law. A salvor may be granted possession of a wreckage site to prevent interference with salvage operations conducted on behalf of the owner, but no similar equity entitles a finder to have exclusive access to obtain title to unowned property.

For the reasons enumerated, we conclude that the district court did not err in denying RMST the opportunity to present evidence in support of a claim that it now be declared a finder with respect to the artifacts recovered from the *Titanic* while remaining the salvor-in-possession of the wreck.

V

In remanding this case to the district court to proceed as a maritime salvage case, we are mindful that the salvage law traditionally does not have as its object the recovery of historical wrecks for historical, archeological, and cultural purposes. The ancient salvage law that has continued to this day was applied to protect the property and lives relating to ships in distress. While the principles of salvage law apply to shipwrecks, again the purpose was to have the salvor recover property for the owner in a trust relationship. *See Titanic I*, 171 F.3d at 964. Under this understanding, the salvage law "offers a premium, by way of honorary award, for prompt and ready assistance to human sufferings; for a bold and fearless intrepidity; and for that affecting chivalry, which forgets itself in an anxiety to save property, as well as life." *The Henry Ewbank*, 11 F. Cas. 1166, 1170 (D. Mass. 1833) (No. 6376).

Thus, when we ask in this case whether RMST's efforts were made for the "prompt and ready assistance to human sufferings"; whether they represent the "chivalry" of the salvage law "which forgets itself in an anxiety to save property, as well as life"; whether they were taken in furtherance of the role of a trustee for the property's owner, we can only respond by questioning whether salvage law is so limited. This point has been noted in recent academic commentary:

> [T]he customary law of salvage cannot easily be applied to historic wreck. Law pertaining generally to wreck is one

thing, but law pertaining specifically to historic wreck (underwater cultural heritage) is quite another. The advent of major treasure salvage is so recent that there simply is not applicable custom, let alone a *jus gentium* that addresses the unique phenomenon of underwater cultural heritage in any coherent way.

James Nafziger, "The Evolving Role of Admiralty Courts in Litigation Related to Historic Wreck," 44 Harv. Int'l L.J. 251, 261 (2003). Nonetheless, the salvage law, by default, has continued to be applied to historic wreck in the modern cases. *See, e.g.*, *Int'l Aircraft Recovery LLC v. Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1263 (11th Cir. 2000); *Columbus-America*, 974 F.2d at 450; *Bemis v. R.M.S. Lusitania*, 884 F. Supp. 1042 (E.D. Va. 1995); *MDM Salvage, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 631 F. Supp. 308 (S.D. Fla. 1986).

Some courts have responded to the awkwardness of fit by attempting to treat historic wrecks under the law of finds. *See, e.g.*, *Zych v. Unidentified, Wrecked & Abandoned Vessel*, 811 F. Supp. 1300 (N.D. Ill. 1992). But when we recognize that a case in finds would award outright title to the finder and that the public interest in long-lost historic wrecks could not be served, we readily conclude that the salvage law is much better suited to supervise the salvage of a historic wreck. Indeed, supervising a historic wreck under the law of finds would leave the court without an ability to regulate what the finder could do with the artifacts found or how it might treat the wreck site. Because the traditional law of salvage, however, involves the creation of a trust relationship between salvor and the court on behalf of the owner, it is not a major step to apply the same principles to historic wreck, creating a trust relationship between the salvor and the court on behalf of the public interest. This of course assumes that the owner no longer exists and its successors or descendants have evidenced no further interest in the wreck. Moreover, any such principles would still yield to one who could establish a right of ownership, if not barred under other relevant defenses.

This application of salvage law to historic wrecks would not significantly change a salvor's role — it would still report to the court and ultimately receive an appropriate award. Moreover, it would effect no

change in RMST's role. RMST has voluntarily and openly pursued its functions as a trustee for the public interest, and the district court has repeatedly accepted that offer. In its annual reports, RMST has stated its mission "to preserve the *Titanic*'s history by keeping its artifacts recovered from the wreck site together as a collection for exhibition to the public, without sale to private collectors, and to obtain oceanic material and scientific data from the *Titanic* wreck site for purposes of historical verification, scientific study and education." One report goes on to quote, as part of RMST's mission, the district court's recognition of RMST's accomplishments in "maximizing the wreck's historical value in returning the wreck's artifacts to society for the general use and education of all mankind."

RMST made such statements to the district court even before it was declared exclusive salvor-in-possession, and the district court has stated that it relied on RMST's statement of mission in declaring RMST the exclusive salvor-in-possession and in entering subsequent orders protecting RMST from competitive interference. *See, e.g.*, *R.M.S. Titanic*, 924 F. Supp. at 718, 723; *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel . . . believed to be the R.M.S. Titanic*, 9 F. Supp. 2d 624, 636 (E.D. Va. 1998). In its October 19, 2001 order, the district court recounted that

> The salvors in possession of this vessel assured this Court throughout the pendency of this case on the Court's docket that they would not sell the artifacts piecemeal and would keep them together to be seen and admired by many people. Before salvor in possession status was ever granted to RMST, the company assured the Court that RMST's intention was to exhibit, not sell, the artifacts that had been salvaged from the ship.

The court referred to an earlier report from RMST in which RMST stated, "The long-term intent of RMST's research and recovery program is to keep the artifacts recovered from the *Titanic* together as a 'collection' and make them available for exhibition to the public."

In connection with its ongoing periodic reports to the district court, the president of RMST has reaffirmed RMST's mission and reported specific additional activities to further the public interest, such as its

hiring of experts and its co-founding, in 1994, the Titanic International Advisory Committee. Specifically, in a February 29, 1996 affidavit filed with the court, George Tulloch, president of RMST, stated with respect to the artifacts that RMST recovered, "In order to ensure the archeological integrity of its research and recovery efforts and honor the historical and scientific significance of its pursuits, [RMST] engaged experts from various fields, including maritime scientists and other professional experts." During that same year, Tulloch testified in court:

> Q: All right, sir. Are you participating in the international Advisory Committee that has been founded by the National Maritime Museum of Great Britain?
>
> A: The Titanic committee, yes.
>
> Q: How are you participating?
>
> A: We are a member to that committee.
>
> Q: What are its purposes?
>
> A: Its purposes are to advise R.M.S. Titanic as to the long-term goals of a permanent *Titanic* memorial museum, and to oversee and advise R.M.S. Titanic as salvor in possession as regards to its responsibility to the wreck site on the R.M.S. Titanic.
>
> Q: All right, sir. You subscribe to the principles of that advisory committee?
>
> A: Yes, sir. And our board has signed a policy statement to that effect.

While we have by default applied traditional salvage law to historic wrecks, both earlier in this case and in prior cases, we now ratify this application as appropriate to a historically or culturally significant wreck. When no person has made a claim to a historical wreck's ownership and any insurance company that has paid a loss in connection

with the wreck has relinquished its interest, the court may appoint the plaintiff to serve as salvor to further the public interest in the wreck's historical, archeological, or cultural aspects and to protect the site through injunctive relief, installing the salvor as its exclusive trustee so long as the salvor continues the operation. The court may, in addition to the traditional salvage remedies, also enter such orders as to the title and use of the property retrieved as will promote the historical, archeological, and cultural purposes of the salvage operation. Indeed, to that end the salvor might be able to obtain public or private funding. Finally, the court must include in its remedies a design to provide the salvor with an appropriate reward, which may include awards *in specie*, full or restricted ownership of artifacts, limitations on use of the artifacts, rights to income from display and shared research, and future rights to salvage.

Of course, if a claim to ownership of a historic wreck is affirmed, then the salvor continues in a trust relationship to the owner, as with any salvage operation.

In recognizing the applicability of salvage law to historic wrecks, we do not create a new cause of action or a new category of salvor. Rather we are explicitly acknowledging the application of salvage law to historic wrecks — an application that has been ongoing now for years — for the purpose of formalizing the salvage trust of historic wrecks and better informing the appropriate participation in such a trust. Thus when the salvor functions in the public interest with respect to a historic wreck, the district court will more readily award it exclusive salvage-in-possession status and, in the same vein, more readily supervise the salvage operation in the public interest. Like all salvage proceedings, however, the encouragement for pursuing salvage of historic wrecks is the salvor's ability to receive exclusive salvage-in-possession status and the promise of an appropriate salvage award, neither of which is provided to the salvor under the law of finds.

## VI

In sum, we vacate the district court's order in this case to the extent that it seeks to exercise *in rem* jurisdiction over the 1987 artifacts or declare a right of title in them. We affirm the district court's order

denying RMST's request to seek to change its role from that of salvor-in-possession to that of a finder. And we remand this case to the district court with the recognition that it may apply the principles of traditional salvage law to the wreck of the *Titanic* in a manner that serves either the owner or, absent an owner, the public interest and at the same time provides an appropriate award to the salvor.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*